In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-1112

JAMES E. KILLIAN,

*Plaintiff-Appellant*,

*v.*

CONCERT HEALTH PLAN, ET AL.,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:07-cv-04755 — **Gary S. Feinerman** and **Marvin E. Aspen**, *Judges*.

ARGUED SEPTEMBER 29, 2011
DECIDED APRIL 19, 2012
REARGUED EN BANC SEPTEMBER 27, 2012
DECIDED NOVEMBER 7, 2013

Before WOOD, *Chief Judge*, and POSNER, FLAUM, EASTERBROOK, RIPPLE, MANION, KANNE, ROVNER, WILLIAMS, SYKES, TINDER, and HAMILTON, *Circuit Judges*.

RIPPLE, *Circuit Judge*. In February 2006, Susan Killian learned that she had lung cancer, which had spread to her brain. After physicians at Delnor Community Hospital

determined that they could not operate, she sought a second opinion from a physician at Rush University Medical Center ("Rush") and soon afterward was admitted for emergency brain surgery. Although the surgery successfully removed the most serious tumor, her cancer treatment was ultimately unsuccessful, and she died a few months later.

At the time of her diagnosis, Mrs. Killian was an employee of Royal Management Corporation ("Royal Management") and participated in its group health insurance, which was provided by Concert Health Plan Insurance Company ("Concert"). Concert paid for part of Mrs. Killian's cancer treatment, but denied coverage, or paid only a small percentage, of services received at Rush. Mr. Killian, the administrator of her estate, brought this action against Concert, Concert Health Plan,[1] Royal Management and Royal Management Corporation Health Insurance Plan (the "Royal Plan") seeking payment of benefits against the Royal Plan and Concert, relief for breach of fiduciary duty against Royal Management and Concert, and statutory penalties against Royal Management.[2]

The district court granted summary judgment for the defendants on the denial of benefits and breach of fiduciary

---

[1] Concert Health Plan was dismissed as a party in earlier proceedings. *See* R.232. Mr. Killian does not appeal that decision.

[2] The district court's jurisdiction was predicated on 29 U.S.C. § 1132(e).

In September 2012, Mr. Killian moved to substitute himself, in his individual capacity, as plaintiff, and we granted his motion. App. R.48. He subsequently has requested substitution again, this time to return himself as administrator of Mrs. Killian's estate. We address this request *infra*.

duty claims and awarded statutory penalties against Royal Management. A panel of this court affirmed the decision of the district court on the first two claims,[3] but remanded for the district court to correct the calculation of statutory penalties. *Killian v. Concert Health Plan* (*Killian I*), 680 F.3d 749, 764–65 (7th Cir. 2012).[4] After rehearing by the en banc court, we adopt the panel's reasoning and conclusion related to the denial of benefits and statutory penalties issues. On the breach of fiduciary duty claim, however, we reverse the judgment of the district court and remand for further proceedings.

# I

## BACKGROUND

Concert began providing insurance to Royal Management's employees in July 2005. The agreement between Royal Management and Concert provided that Royal Management would be the plan administrator and that Concert would be the "administrator for claims determinations" and the "ERISA [Employee Retirement Income Security Act] claims review fiduciary" with "full and exclusive discretionary authority to: 1) interpret Policy or Group Plan provisions; 2) make decisions

---

[3] On the denial of benefits claim, the panel directed the parties to submit a stipulation as to whether the providers at Rush were within Mrs. Killian's network. *Killian v. Concert Health Plan* (*Killian I*), 680 F.3d 749, 764 (7th Cir. 2012).

[4] Our jurisdiction is predicated on 28 U.S.C. § 1291.

regarding eligibility for coverage and benefits; and 3) resolve factual questions relating to coverage and benefits."[5]

While employed with Royal Management, Mrs. Killian enrolled in the Royal Plan and selected coverage under the "SO35 Open Access" option. The Master Group Policy and accompanying Certificate of Insurance applicable to her SO35 plan described the terms, exclusions, conditions and benefits available under the Royal Plan. Participants were cautioned to seek services from network providers whenever possible and told that "[t]o confirm that Your … provider is a CURRENT participant … You must call the number listed on the *back* of Your medical identification card."[6] The Master Group Policy did not specify which of several numbers on the back of the card should be called, and a few pages later it instructed participants to obtain provider participation information by calling an unspecified "toll free telephone number *on* your identification card."[7] Participants also were directed to "call the number" on their identification cards to verify infertility benefits, or appeal a decision denying benefits.[8] They were instructed to follow the procedures described in the

---

[5] R.259-3 at 77.

[6] *Id.* at 15 (emphasis added).

[7] *Id.* at 19 (emphasis added).

[8] *Id.* at 42, 49, 50.

"Utilization Management section" when receiving emergency care.[9]

The front of Mrs. Killian's insurance card listed toll-free numbers under four different headings. The second and most prominently listed number was for "Customer Service," which was the same toll-free number for "Utilization review." The back of her card listed toll-free numbers under three different headings, but used the same toll-free number for "UTILIZATION REVIEW" and medical claims.[10] Both sides of this card are appended to this opinion.

In late February 2006, Mrs. Killian sought treatment from her primary care physician, Dr. Bradshaw, for a severe cold and persistent headaches. A CT scan revealed the presence of three brain tumors, and she was diagnosed with lung cancer, which had metastasized to her brain. Mrs. Killian then went to Delnor Community Hospital; she stayed for five days, but her physicians concluded that they could not operate on the tumors. Seeking a second opinion, the Killians scheduled an appointment with Dr. Philip Bonomi, a physician at Rush who had treated Mrs. Killian's daughter before she died of cancer in 2001. The Killians met with Dr. Bonomi and Dr. Louis Barnes, a neurosurgeon, on April 7, 2006. Dr. Barnes reviewed Mrs. Killian's medical records, including the CT scan, and determined that Mrs. Killian would be dead in five days unless the largest tumor was removed immediately.

---

[9] *Id.* at 21.

[10] R.82-7 at 2–3.

The Killians did not contact Concert before meeting with Dr. Bonomi because their plan to see Dr. Bonomi for a second opinion did not depend on whether he was in Mrs. Killian's network. However, when they learned that Mrs. Killian had only a few days to live unless the largest tumor was removed and that physicians at Rush could perform the necessary surgery, Mr. Killian called Concert about the developing situation. He first called the "provider participation" number listed on the front of Mrs. Killian's insurance card. Mr. Killian informed the Concert representative that he and Mrs. Killian were at St. Luke's Hospital[11] for a second opinion, that the physicians had determined that the tumor had to be removed and that the physicians wanted Mrs. Killian to be admitted for brain surgery. The representative searched her database and could not find any information on "St. Luke's," but told Mr. Killian to "go ahead with whatever had to be done."[12] She also told him to call back later.[13]

Mr. Killian called back later the same day, April 7, but this time he called the number listed under the prominent "Customer Service" heading on the front of Mrs. Killian's insurance card, which is the same number under the heading

---

[11]  Rush University Medical Center adopted its current name in 2003. *See History*, Rush University Medical Center Careers, http://www.jobsatrush.com/history.htm (last visited Mar. 18, 2013). Before that, Rush's name incorporated the name of a predecessor entity, St. Luke's. *Id.*

[12]  R.87 at 2.

[13]  R.253 at 72.

"Utilization review" on the front and back of the card and is also listed as the number for medical claims. The representative who took the second call seemed to be aware of Mr. Killian's earlier call and confusion about the name of the hospital because when he mentioned Rush she said, perhaps in jest, "Oh, you mean St. Luke's."[14] He could hear her laugh and tell a colleague, "It's the guy from St. Luke's."[15] When Mr. Killian told the representative, "I'm trying to get confirmation that we are going to be—my wife is going to be admitted to Rush," the representative said, "Okay."[16] She did not tell Mr. Killian whether services at Rush were in or out of network or whether there would be any limits to coverage.[17]

Mrs. Killian underwent surgery at Rush two days later, April 9, and was released on April 12, 2006. The record is silent as to whether the Killians would have gone to a different hospital or sought emergency admission at Rush[18] had Concert representatives told Mr. Killian that Rush was not in Mrs. Killian's network. After the surgery, she received some outpatient services from Dr. Bonomi, and, in June 2006, she

---

[14]  *Id.* at 73.

[15]  R.87 at 2.

[16]  R.253 at 73.

[17]  The record does not contain call logs or other objective proof of which numbers Mr. Killian called; however, Concert never has disputed these facts.

[18]  Services received on an emergency basis are processed at the in-network level. *See* R.251 at 91.

was admitted to Rush on an emergency basis for nine days to be treated for pneumonia. Mrs. Killian attempted chemotherapy but could not tolerate it, and she died in August 2006.

During the months between Mrs. Killian's surgery and death, Mr. Killian received notices from Concert stating that Concert would not cover services at Rush because the hospital was not in Mrs. Killian's network. In response to a letter from Mr. Killian disputing the denial and requesting immediate review, Concert reiterated that the claims were out of network and that the Killians were responsible for the maximum allowable fee. When Mr. Killian appealed, Concert agreed to consider Mrs. Killian's treatment for pneumonia as an emergency and to process the claim for that treatment at the in-network level. The remaining claims total approximately $80,000.

Mr. Killian filed this action in his capacity as administrator of Mrs. Killian's estate, and discovery ensued. The proceedings before the district court included multiple motions to dismiss and for summary judgment, and Mr. Killian amended his complaint twice. Finally, the district court granted summary judgment in favor of the defendants on the denial of benefits and breach of fiduciary duty claims and granted statutory penalties against Royal Management for failure to provide Mrs. Killian with a summary plan description.

On the denial of benefits claim, Mr. Killian argued that Concert's decision to deny benefits should not be sustained because Concert did not comply with ERISA's notification requirements and because there was no evidence supporting

Concert's determination that Rush and Dr. Bonomi were not in Mrs. Killian's network. Section 1133(1) of Title 29 requires that when a benefits claim is denied, the plan must give notice to the beneficiary by "setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant." Failure to comply substantially with § 1133 may be grounds for reversing an administrator's decision. *See Love v. Nat'l City Corp. Welfare Benefits Plan*, 574 F.3d 392, 396 (7th Cir. 2009). The district court determined that the notifications sent by Concert did not comply with all of the technical requirements set forth in 29 C.F.R. § 2560.503-1(j).[19] However, the court held that, because Concert's letters substantially complied with ERISA's notification requirements, the deficiencies did not warrant a finding that Concert's decision

---

[19] In particular, the district court determined that Concert's notification letters

> failed to identify, by name, any "specific rule, guideline, protocol, or other similar criterion" used in reaching the decision. 29 C.F.R. § 2560.503-1(j)(5). The letters neglect to inform Killian that a copy of any relevant document, rule or other information will be provided to him at no cost, upon request. *Id.* The letters also say nothing about [Concert's] internal appeals procedures, available dispute resolution options, or Killian's right to sue under 29 U.S.C. § 1132(a). (*Id.*) Indeed, as Killian has emphasized throughout these proceedings, these notifications letters are quite sloppy. For example, they refer to Susan's network as the PHCS (Open Access) Network, even though that is not the network mentioned in the COI.

*Killian v. Concert Health Plan Ins. Co.*, No. 07-cv-04755, 2010 WL 2681107, at *8 (N.D. Ill. July 6, 2010).

was arbitrary and capricious. In addition, it held that there was no need to remand to Concert because Mr. Killian did not allege that the providers in question were within Mrs. Killian's network.[20]

On the breach of fiduciary duty claim, Mr. Killian argued that Concert and Royal Management failed to provide Mrs. Killian with an adequate summary plan description. The district court granted summary judgment for the defendants because Mr. Killian had failed to show bad faith, purposeful concealment or detrimental reliance.[21] Mr. Killian moved for reconsideration arguing that the district court had overlooked our decision in *Kenseth v. Dean Health Plan, Inc.*, 610 F.3d 452 (7th Cir. 2010), and had failed to address the two telephone calls that he made to Concert on the day of the appointment with Dr. Bonomi. Mr. Killian argued that Concert breached its fiduciary duty by failing to inform him that Rush was out of network and that coverage of any services received at Rush would be limited. The district court dismissed this argument on the grounds that Concert did not give Mr. Killian any information about whether Rush was in network and because the Killians had not relied on any statements made by Concert

---

[20] *Id.* at *9–10. The district court did not interpret Mr. Killian's briefs as arguing that Concert erred in determining that Rush and Dr. Bonomi were out of network. Mr. Killian did make this argument. *See* R.86 at 12; R.263 at 8–9; R.290 at 8–9. The panel resolved this potential problem by requiring the parties to submit a stipulation as to whether Rush, Dr. Bonomi and Dr. Barnes were out of network, *Killian I*, 680 F.3d at 764, and we agree with that disposition, *see infra* p. 26.

[21] *Killian*, 2010 WL 2681107, at *11.

or Royal Management; it additionally noted that Mr. Killian should have raised this argument in his opposition to summary judgment.[22]

A new district judge took over the case after summary judgment on the denial of benefits and breach of fiduciary duty claims. That judge addressed the separate claim for statutory penalties for failure to provide plan documents and ordered Royal Management to pay Mr. Killian $5,880.[23]

After a final judgment was entered in the district court, Mr. Killian timely appealed. A panel of this court affirmed summary judgement for the Royal Plan and Concert on the denial of benefits claim, but required the parties to submit a

---

[22] *Killian v. Concert Health Plan Ins. Co.*, No. 07-cv-04755, 2010 WL 3000205, at *2 (N.D. Ill. July 28, 2010). On appeal, Royal Management and Concert did not argue that Mr. Killian waived this argument, thus waiving any waiver. *Killian I*, 680 F.3d at 757; *Westefer v. Snyder*, 422 F.3d 570, 584 n.20 (7th Cir. 2005). Some of our dissenting colleagues, in contradistinction to their position in the panel opinion, *Killian I*, 680 F.3d at 757, now maintain that Mr. Killian waived his fiduciary duty argument by not raising it before the district court. As the panel noted, "Concert did not argue that James had waived the argument." *Id.* Accordingly, any waiver was in turn waived by the defendants. *Westefer*, 422 F.3d at 584 n.20. Nor can we accept the proposition that Mr. Killian's brief in this court was so abbreviated on the subject as to have failed to alert them to this contention.

[23] *Killian v. Concert Health Plan*, No. 07-cv-04755, 2010 WL 5316041, at *2–3 (N.D. Ill. Dec. 17, 2010). Section 1024(b)(4) of Title 29 requires an administrator, upon written request, to furnish a beneficiary with certain plan documents. A beneficiary may seek statutory penalties against an administrator who fails to provide the requested documents within thirty days. 29 U.S.C. § 1132(c)(1).

stipulation as to whether Rush, Dr. Bonomi and Dr. Barnes were in Mrs. Killian's network. The panel also affirmed summary judgment for Royal Management and Concert on the fiduciary duty claim. On the statutory damages claim, the panel reversed and remanded because the district court used the wrong dates in calculating the penalty and failed to address one of Mr. Killian's arguments.

## II

## DISCUSSION

As noted earlier, we affirm the panel's decision on the denial of benefits and statutory penalties claims; we therefore limit our discussion here to the one claim upon which we chart a course different from that set out in the panel opinion: the breach of fiduciary duties. Mr. Killian submits that Royal Management and Concert breached their fiduciary duties in two ways: first, by failing to provide Mrs. Killian with a summary plan description and, second, by failing to inform him that Mrs. Killian's providers were out of network during telephone conversations on April 7, 2006.

A beneficiary is entitled to relief for a breach of fiduciary duty if he proves "(1) that the defendant is a plan fiduciary; (2) that the defendant breached its fiduciary duty; and (3) that the breach resulted in harm to the plaintiff." *Kenseth*, 610 F.3d at 464. It is not disputed here that Royal Management and Concert are both fiduciaries under ERISA. Accordingly, with respect to each of Mr. Killian's theories on this claim, the issues before us are only those of breach and harm.

On the first theory, related to the failure to provide a summary plan description, the panel determined that Royal Management and Concert breached their fiduciary duty. It nevertheless affirmed summary judgment in favor of the defendants because Mr. Killian could not show that the lack of a summary plan description caused his harm. We agree with this result because Mr. Killian knew that he could determine a provider's network status by calling a number on Mrs. Killian's insurance card, and we adopt the panel's decision on this matter.

A review of Mr. Killian's second theory of breach of fiduciary duty is more difficult to resolve, and it is with respect to this specific theory that we depart from the conclusions of the panel decision.

We pause at this point to set forth, for the convenience of the reader, the path of our discussion. First, we examine whether there is sufficient evidence of a controversy between the parties to exercise jurisdiction over this claim. We conclude that, although the full nature and extent of the harm is a merits question, it is clear that, as this case comes to us today, there is a live dispute between the parties about the merits of the claim that justifies the exercise of our jurisdiction.[24]

Having resolved this threshold issue, we shall then turn to the merits. On this point, we agree with Mr. Killian that, because the plan documents provided to Mrs. Killian were

---

[24] Our reasoning with respect to the justiciability of the disputed claim applies as well to the other claims decided by the panel that are not controverted in this en banc proceeding.

incomplete in themselves, we must evaluate in some depth whether that deficiency was cured in the telephone calls Mr. Killian made to Concert on April 7, 2006. For the reasons set forth in more detail below, we conclude that the summary judgment record does not permit us to resolve this issue of breach in favor of the defendants. Assuming that the question of breach is resolved in favor of Mr. Killian the summary judgment record similarly raises a genuine issue of triable fact on the question of harm.

We now turn to a plenary discussion of the issues we have just outlined.

**A.**

In September 2012, following the panel decision in this case, Mr. Killian notified the court that Mrs. Killian's estate had been closed in August 2011. At the time, the only asset held by the estate was its claim against the defendants, which was distributed to Mr. Killian. Mr. Killian moved to substitute himself as plaintiff in his individual capacity, rather than as administrator of Mrs. Killian's estate. We granted his motion. We were concerned, however, about whether this change affected our jurisdiction under the case or controversy requirement of Article III of the Constitution of the United States. This concern obligated us to consider the matter further. *See North Carolina v. Rice*, 404 U.S. 244, 245–46 (1971) (per curiam). Accordingly, following reargument en banc, we ordered additional briefing to assist us in determining whether, in light of the closing of the estate, "Mr. Killian retains any interest in obtaining relief and whether the relief

sought by Mr. Killian will make a difference to his legal interests." The parties responded. In his submission, Mr. Killian notified the court that he had reopened Mrs. Killian's estate and again sought to pursue the claim on behalf of the estate. Having reviewed the submissions, we now conclude that there is a live controversy between the parties such that our jurisdiction over the matter is not in question.

Under Article III, the federal courts "may only adjudicate actual, ongoing controversies." *Honig v. Doe*, 484 U.S. 305, 317 (1988). When a case becomes moot, this constitutional requirement is lacking. *United States v. Segal*, 432 F.3d 767, 773 (7th Cir. 2005) (noting that a case is moot if the controversy between the parties *has been resolved*). The Supreme Court recently has reiterated, simply and directly, the governing principle in any mootness inquiry:

> There is thus no case or controversy, and a suit becomes moot, when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome. But a case becomes moot *only when it is impossible for a court to grant any effectual relief whatever to the prevailing party*.

*Chafin v. Chafin*, 133 S. Ct. 1017, 1023 (2013) (emphasis added) (citations omitted) (internal quotation marks omitted). That is, although "federal courts are without power to decide questions that cannot affect the rights of litigants in the case before them," *Rice*, 404 U.S. at 246, "[a]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot," *Knox v. Serv. Emps. Int'l Union, Local 1000*, 132 S. Ct. 2277, 2287 (2012) (internal quotation

marks omitted). Consequently, "[t]he burden of demonstrating mootness is a heavy one," *Los Angeles Cnty. v. Davis*, 440 U.S. 625, 631 (1979) (internal quotation marks omitted), borne by the party seeking to have the case declared moot, *see, e.g.*, *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 569–70 (1984).

Notably, the Court also has counseled that we must be careful not to "'confuse[] mootness with whether [the plaintiff] has established a right to recover …, a question which it is inappropriate to treat at this stage of the litigation.'" *Chafin*, 133 S. Ct. at 1024 (second and third alterations in original) (quoting *Powell v. McCormack*, 395 U.S. 486, 500 (1969)). In the present case, to succeed *on the merits* of the fiduciary duty claim (the claim that was in the possession of Mrs. Killian's estate before it was closed), Mr. Killian must present evidence from which a factfinder can conclude that the estate suffered a harm from a breach on the part of the defendants. But that is a burden that he must carry on the merits. At this stage, by contrast, as we consider our basic subject matter jurisdiction, Mr. Killian must assert such a cognizable injury and demonstrate that it is possible for the court, were it to agree with Mr. Killian's arguments on liability, "to 'fashion *some* form of meaningful relief,'" *Flynn v. Sandahl*, 58 F.3d 283, 287 (7th Cir. 1995) (emphasis in original) (quoting *Church of Scientology v. United States*, 506 U.S. 9, 12 (1992)). As we noted in *Dixon v. ATI Ladish LLC*, 667 F.3d 891, 894 (7th Cir. 2012), "a good defense to liability is a reason why defendants prevail on the merits rather than a reason why the litigation should be dismissed without prejudice—which is the consequence of mootness." *See also Chafin*, 133 S. Ct. at 1025 (noting that uncertainty as to whether

an order will be followed or enforced does not render a case moot); *Segal*, 432 F.3d at 773 (noting that the advisability of a particular remedy "is not relevant to the mootness inquiry"); *cf. Harzewski v. Guidant Corp.*, 489 F.3d 799, 804 (7th Cir. 2007) (reversing a district court's dismissal for lack of standing because "the question whether an ERISA plaintiff is a 'participant' entitled to recover benefits under the Act should be treated as a question of statutory interpretation fundamental to the merits of the suit rather than as a question of the plaintiff's right to bring the suit"). In short, the mootness inquiry turns on "whether the *relief sought* would, if granted, make a difference to the legal interests of the parties (as distinct from their psyches, which might remain deeply engaged with the merits of the litigation)." *Air Line Pilots Ass'n, Int'l v. UAL Corp.*, 897 F.2d 1394, 1396 (7th Cir. 1990) (emphasis added).

The closing and reopening of the estate is an odd circumstance, but one that unnecessarily, in our view, complicates the jurisdictional inquiry. Regardless of whether the estate is opened or closed, there is no question that the parties have a current, live dispute with both immediate and potential future consequences. Mrs. Killian incurred significant medical bills preceding her death. *See generally* R.77-4, 77-5 (medical bills and explanations of benefits). The record reflects that she (or Mr. Killian after her death) paid several of those bills. *See, e.g.*, R.77-5 at 18 ($65.77 paid to "Rush University Medical Center" for services dated 04/08/2006); *id.* at 19 ($11.87 paid to "Rush University Medical Center" for services dated 04/07/2006); *id. at* 40 ($10 paid to "Rush University Medical Center" for services dated 04/07/2006). Those debts incurred—and bills actually paid—would not necessarily have

been the same had the defendants covered her care to the extent required had the providers been in-network. Indeed, the record suggests that co-pay, coinsurance, and annual deductible amounts differ depending on whether a service is obtained from an in-network or out-of-network provider. *See* R.77-3 at 65–69 (setting forth the applicable costs under the SO35 Open Access plan, the plan in which Mrs. Killian was enrolled). The estate, therefore, already has suffered this concrete and redressable injury, and this fact alone is sufficient to secure our jurisdiction.

Although these amounts in themselves are sufficient to prevent us from declaring the case moot, it would be wrong to suggest that the only consequence of resolving this dispute would be to settle debts on these amounts already paid. Since Mrs. Killian's death, the dispute in this case *always has been* one between Mr. Killian and the defendants over his wife's coverage and their family's resulting liability on third-party medical debts. Initially, he pursued this dispute through the vehicle of a probate estate, with the entire corpus of the estate being the claims against the defendants. Tied up in the same dispute, however, are the debts that Mrs. Killian died owing, which we understand could have been collected by her medical creditors either through claims against her estate or directly against Mr. Killian under the Illinois Family Expense Act, 750 ILCS 65/15. For practical purposes, as far as Mr. Killian was concerned, the vehicle the creditors pursued was of little consequence. In the end, the responsibility for payment rested with him, either as administrator of the estate or because of his direct and personal liability. Unsurprisingly, the creditors appear to have pursued the path of least resistance and billed

Mr. Killian directly.[25] Also unsurprisingly, the record does not reflect that any of the medical providers have ever instituted judicial proceedings to collect on the debts as opposed to working with Mr. Killian toward payment, perhaps at the conclusion of this litigation. Given these circumstances, Mr. Killian's initial decision to close the estate is understandable. It was *Mrs. Killian*'s claim, but he inherited it, and, in any event, the consequence of the resolution of the dispute, whatever it may be, falls to him alone. The estate is and has always been a construct to resolve this dispute. We find it equally understandable that, once it appeared from the court's own request for supplemental filings that the closing of the estate *might* matter for our purposes, Mr. Killian accommodated that possibility by reopening the estate. Whether, as a matter of state law, that vehicle is a viable or preferable way of proceeding is of secondary importance to our present inquiry. By no account is the present dispute resolved, and by no account has there been any fundamental shift in the relationship of the parties to the dispute.[26]

---

[25] Judge Manion's dissent (hereinafter dissent) contends that this statement is unsupported by the record, which includes copies of bills submitted to Mrs. Killian. However, Mr. Killian stated in his affidavit that the providers "continue to bill me," R.87 at 2, and counsel informed us both at oral argument and in response to our request for supplemental filings that Rush providers have continued to be in contact with Mr. Killian through his attorneys regarding the amounts still owed for Mrs. Killian's care. Regardless of the name atop the bills received, it is apparent that the providers have sought reimbursement from the Killians directly.

[26] The dissent asserts that any harm that has been suffered or might be
(continued...)

The foregoing discussion reveals the direct financial
interests at stake in the amounts already paid, and the
sufficiently real possibility that the additional debts may come
Mr. Killian's way. In light of the reopening of the estate, the
contention in Judge Manion's dissent (hereinafter dissent) that
there is no possibility of recovery of the medical bills from the
estate, and therefore no apparent harm to the estate, is not
demonstrably correct. Whether that contention was correct
while the estate was closed is a somewhat complicated
question. In Illinois, the fact that an estate is closed may, but
does not necessarily, preclude creditors from bringing claims
against it. In *Schloegl v. Nardi* (*In re Estate of Perrine*), 234 N.E.2d
558, 561 (Ill. App. Ct. 1968), the Illinois Court of Appeals held
that an estate that had been duly administered and closed

---

[26] (...continued)
suffered by Mr. Killian from an unfavorable resolution of this dispute arises
not from his status relative to the estate, but by operation of Illinois law,
given his marriage to Mrs. Killian at the time she incurred medical bills. It
attempts to illustrate the point by imagining that the Killians had divorced
following the medical care in question, such that Mr. Killian might continue
to be liable (and continue to benefit from a favorable resolution of the
present dispute) despite not being the beneficiary of her estate. But the
premise of the dissent's exercise underscores the central issue. The Killians
did not divorce, and Mr. Killian stands before the court in his proper
person, both husband and administrator/beneficiary, asking the court to
resolve the same issue he has always asked it to resolve, and for the same
reason: He has faced and continues to face uncertain liabilities relating to
Mrs. Killian's care at Rush.

Accordingly, we deem Mr. Killian's most recent motion to substitute to
be instead a motion to add himself in his capacity as administrator of the
estate as a plaintiff to this action, and we grant the motion.

could be reopened when a plaintiff brought a personal injury claim against the decedent. Subsequent cases have distinguished *Schloegl*, but have not rejected its conclusion that a claim may be brought against an estate if the time for bringing such claims has not expired. *See McCue v. Colantoni*, 400 N.E.2d 683, 687 (Ill. App. Ct. 1980) (rejecting a personal injury claim against an estate because, unlike the claim in *Schloegl*, the claim was brought after the limitations period for personal injury claims had expired); *Dichtl v. Foster McGaw Hosp.* (*In re Estate of Garawany*), 399 N.E.2d 1024, 1026–27 (Ill. App. Ct. 1980) (rejecting a late claim brought by medical providers because, unlike in *Schloegl*, the insurance policy already had been paid to the estate); *see also Rivera v. Taylor*, 336 N.E.2d 481, 485 (Ill. 1975) (noting that the statute governing the period for bringing claims against an administrator would not bar a personal injury claim before the end of the limitations period for that claim).

Any claim against Mr. Killian or Mrs. Killian's estate would likely be brought to enforce the agreement between Mrs. Killian and the Rush providers or against Mr. Killian for payment under the Illinois Family Expense Act, 750 ILCS 65/15. The limitations period for actions on written contracts or written evidence of indebtedness is ten years. 735 ILCS 5/13-206. A five-year limitations period applies to "actions on unwritten contracts, expressed or implied," 735 ILCS 5/13-205, and claims for family expenses under the Family Expense Act, *id.*; *Juechter v. Grace*, 371 N.E.2d 179, 181 (Ill. App. Ct. 1977). These limitations periods may be tolled if the party to be charged makes a partial payment, *St. Francis Med. Ctr. v. Vernon*, 576 N.E.2d 1230, 1231 (Ill. App. Ct. 1991), or new

written promise to pay, *Chase v. Bramhall*, 98 N.E.2d 529, 531 (Ill. App. Ct. 1951). The record suggests that Mrs. Killian agreed to be responsible for the charges, *see, e.g.*, R.77-5 at 36 (bill from Rush listing Mrs. Killian as "Guarantor"), and makes clear that at least some payments were made. There is no evidence as to whether the Killians, or Mr. Killian on behalf of the estate, also agreed in writing to pay all or portions of the remaining bills as counsel informs us he has done verbally throughout the course of these proceedings.

In any event, as we have noted, the estate has been reopened and, in light of the proceedings in this case, claims for payment that were being sent to Mr. Killian might be pursued now against the estate. This reality is also certainly sufficient to support our exercise of jurisdiction.

The dissent makes much of its assessment that, as against the estate or Mr. Killian personally, all relevant limitations periods have run, and therefore Mr. Killian has no reasonably foreseeable injury on the horizon. It ignores, however, that the *debt* to the providers already incurred is not contested in this action and persists as a matter of state law regardless of the running of any limitations period. *La Pine Scientific Co. v. Lenckos*, 420 N.E.2d 655, 658 (Ill. App. Ct. 1981) (noting that statutes of limitation "bar the right to sue for recovery but do not extinguish the debt which remains as before"); *Cook v. Britt*, 290 N.E.2d 908, 909 (Ill. App. Ct. 1972) ("[A] statute of limitations is an act limiting the time within which legal action shall be brought and affects the remedy only and not a substantive right."). In any event, we simply do not know the scope of Mr. Killian's legal liability on that debt, nor do we know the extent of his exposure to the detrimental

consequences of having significant unpaid bills. In short, whether Mr. Killian or the estate would have valid legal defenses, including applicable statutes of limitation, to any separate legal action to *enforce* the debt is simply not a dispositive inquiry for present purposes.

One more point bears noting. The parties seem to have focused their jurisdictional arguments on whether there is a stated right to *damages*, and the above discussion therefore concentrates on that approach. However, Mr. Killian's prayer for relief in the operative complaint and, indeed, the words of the statute, do not restrict the relief available in this case to monetary relief. Particularly relevant to the present case, the possibility of meaningful declaratory relief supports an exercise of jurisdiction.[27]

On the issue of mootness, "[t]he question is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Super Tire Eng'g Co. v. McCorkle*, 416 U.S. 115, 122 (1974) (internal quotation marks omitted). The record before us makes clear that this jurisdictional threshold is satisfied. Mr. Killian's financial affairs are burdened with real uncertainty as a result of his wife's last illness, and a district court *could* award declaratory

---

[27] Mr. Killian's requested relief is broad enough to encompass a declaratory judgment. *See* R.134 at 12–13 (requesting relief in the form of payment of medical bills, attorney's costs and fees and "such other legal or equitable relief as the court deems appropriate").

relief that would alter significantly that burden.[28] When the possibility of declaratory relief is considered together with past and potential future pecuniary losses to the estate that might justify monetary relief, there is no question that the case before us is a live one and one in which the court, by granting a form of the requested relief, can alter substantially the relationship of the parties.

On remand, the district court must deal with the questions of liability and, if it reaches the question, remedy. This latter issue will require the district court to resolve many factual and legal matters on which the present record now permits only speculation. For the present moment, it is sufficient to say that the record fails to establish definitively that the Killians incurred no harm as a result of the alleged breach. Nor is it clear that declaratory relief would be unavailable to Mr. Killian.

In light of the fact of losses already supported by the record and persisting uncertainties concerning the future liability of the estate *and* its beneficiary, we cannot say that "there is nothing for us to remedy, even if we were disposed to do so." *Spencer v. Kemna*, 523 U.S. 1, 18 (1998). The case is not moot, and we must proceed to the merits.

---

[28] The harm necessary to succeed with the claim, as we have noted, belongs to the estate. In light of the particular factual circumstances of the case, however, Mr. Killian's personal liabilities on Mrs. Killian's debts would not be irrelevant to a court fashioning appropriate declaratory relief in its discretion. In short, there is more at stake here than Mr. Killian's "wish that the Rush doctors receive additional compensation for their services and … desire [for] vindication for the wrong he perceives." Dissent at 73.

## B.

In determining whether a fiduciary duty has been breached, our inquiry is guided by the plain wording of the statute and by established case law. As fiduciaries, Royal Management and Concert, in fulfilling their duties to Mrs. Killian and other plan participants, must

> discharge [their] duties … solely in the interest of the participants and beneficiaries and … with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

29 U.S.C. § 1104(a)(1)(B). These duties are analogous to those of loyalty and care that are imposed upon a trustee under the common law. *See Kenseth*, 610 F.3d at 465–66.

Our decision in *Kenseth* sets forth, with great precision, how the command of the statute ought to be applied in a situation such as the one before us. There, we recognized that

> "once an ERISA beneficiary has requested information from an ERISA fiduciary who is aware of the beneficiary's status and situation, the fiduciary has an obligation to convey complete and accurate information material to the beneficiary's circumstance, *even if that requires conveying information about which the beneficiary did not specifically inquire.*"

*Id.* at 466 (emphasis in original) (alteration omitted) (quoting *Gregg v. Transp. Workers of America Int'l*, 343 F.3d 833, 845–46 (6th Cir. 2003)). "Regardless of the precision of his questions, once a beneficiary makes known his predicament, the fiduciary 'is under a duty to communicate … all material facts in connection with the transaction which the trustee knows or should know.'" *Id.* at 467 (alteration in original) (quoting Restatement (Second) of Trusts § 173, cmt. d (1959)).

If "the plan documents are clear and the fiduciary has exercised appropriate oversight over what its agents advise plan participants and beneficiaries as to their rights under those documents, the fiduciary will not be held liable simply because a ministerial, non-fiduciary agent has given incomplete or mistaken advice to an insured." *Id.* at 472. Nevertheless, if a fiduciary "suppl[ies] participants and beneficiaries with plan documents that are silent or ambiguous on a recurring topic, the fiduciary exposes itself to liability for the mistakes that plan representatives might make in answering questions on that subject." *Id.*

In the present case, we cannot say that the pertinent plan documents were clear and complete as to which service providers were in Mrs. Killian's network. The Killians never have received a summary plan description, which must contain "the composition of the provider network," 29 C.F.R. § 2520.102-3(j)(3),[29] and the Master Group Policy does not

---

[29] The summary plan description for employee health plans must include, *inter alia*,

(continued...)

identify which providers are in network. Instead, beneficiaries are instructed to either "call the number listed on the back of [their] medical identification card[s]" or "call[] the toll free telephone number on [their] identification card[s]" to determine whether a provider is in network.[30] The situation before us is therefore much like the one that we confronted in *Kenseth*, where the policy documents' only advice for determining "whether a particular course of treatment was covered by the … plan was to call [the fiduciary]'s customer service line." 610 F.3d at 477. Here, the Master Group Policy simply instructed participants to contact Concert before undergoing treatment to determine whether the providers would be in network. They were given no more direction. Concert asserts that directing beneficiaries to call is the best way to confirm network provider information because its list of network providers frequently changes. We do not necessarily disagree with Concert's conclusion; we merely point out that this approach made the plan documents

---

[29] (...continued)

> provisions governing the use of network providers, [and] the composition of the provider network, … . In the case of plans with provider networks, the listing of providers may be furnished as a separate document that accompanies the plan's SPD, provided that the summary plan description contains a general description of the provider network and provided further that the SPD contains a statement that provider lists are furnished automatically, without charge, as a separate document.

29 C.F.R. § 2520.102-3(j)(3).

[30] R.259-3 at 15, 19.

incomplete. Consequently, Concert "expose[d] itself to liability for the mistakes that [its] representatives might make in answering [Mr. Killian's] questions on that subject." *Id.* at 472.

## C.

Because the instructions given in the provided plan documents were deficient, we must examine the substance of the telephone calls between Mr. Killian and Concert. In our view, a reasonable trier of fact certainly could conclude that Concert was aware (or, at the very least, that it should have been aware) that Mr. Killian was attempting to determine whether Rush and the physicians who were about to perform surgery on Mrs. Killian were within Mrs. Killian's network.

### 1. The First Telephone Call

The front of Mrs. Killian's insurance card provides telephone numbers under four different headings. The first number is for "determin[ing] Provider participation."[31] This was a "dedicated line" for providing "[t]he most *accurate, up to date information*" regarding provider participation.[32] Because this line was dedicated to informing beneficiaries whether providers were in network, Concert knew (or, at the very least, should have known) that beneficiaries would call this line to determine a provider's network status. As such, when a

---

[31] R.82-7 at 2.

[32] R.259-5 at 10 (emphasis in original).

beneficiary calls this number, Concert "'has an obligation to convey complete and accurate information material to [provider participation status], *even if that requires conveying information about which the beneficiary did not specifically inquire*,'" *Kenseth*, 610 F.3d at 466 (emphasis in original) (quoting *Gregg*, 343 F.3d at 845–46), "[r]egardless of the precision of his questions," *id.* at 467.

Mr. Killian called this number on April 7, 2006. After providing Mrs. Killian's name and card number, he said, "we are here for a second opinion and she is going—they want to admit her because we already determined the tumor has to come off." R.253 at 72; *see also id.* at 125 ("I said she was being admitted to the hospital and they were going to do the surgery."). Mr. Killian referred to Rush as "St. Luke's," the name that he always had used for this hospital. The Concert representative said that she was unable to find a listing under that name and instructed Mr. Killian to "[g]ive [her] a call back."[33] She also said that Mrs. Killian should "go ahead with whatever had to be done."[34] Although the representative did not state directly that Rush was in Mrs. Killian's network, a reasonable trier of fact could conclude that this representative failed "to convey complete and accurate information material to [Mrs. Killian]'s circumstance." *Kenseth*, 610 F.3d at 466 (internal quotation marks omitted). Mr. Killian at one point testified that he and the representative "never determined

---

[33] R.253 at 72.

[34] *Id.* at 124–25.

anything," during this telephone call.[35] However, he also testified that, at the end of the two calls, he believed that Mrs. Killian's surgery would be covered "[b]ecause nobody ever said these [providers] are out-of-network."[36]

Taking these facts in the light most favorable to Mr. Killian for purposes of summary judgment, a reasonable trier of fact could conclude: (1) that Mr. Killian was concerned about whether the providers were in network; (2) that Mr. Killian called the number that Mrs. Killian's insurance card said should be used to determine provider participation to resolve this question; (3) that the representative knew that Mr. Killian was seeking this information; (4) that the representative told Mr. Killian to "go ahead with whatever had to be done," even though she knew that she had not been able to establish the provider's network status; and (5) that Mr. Killian left that telephone call believing that Mrs. Killian could "go ahead with whatever had to be done" because he had followed the instructions on Mrs. Killian's insurance card, was told to do so and received no warning that the "go ahead" was not to be understood as an authorization. Mr. Killian's testimony is susceptible to the interpretation that, during the stress of the moment, he believed that he could rely on the representative's instruction to "go ahead." Mr. Killian "should not be penalized because he failed to comprehend the technical difference between '[go ahead]' and '[the provider is in network].' The same ignorance that precipitates the need for answers often

---

[35] *Id.* at 72.

[36] *Id.* at 136.

limits the ability to ask precisely the right questions." *Kenseth*, 610 F.3d at 467. A finder of fact would be entitled to conclude that, at the very least, the representative should have instructed Mr. Killian that she was unable to locate an entry in her system for "St. Luke's" and that she could make no representations at that time as to whether the provider was in network.

The fact that Mr. Killian made a second call does not necessarily negate his claim of reliance on the instruction to "go ahead." Mr. Killian testified that, in making the second telephone call, he was calling "for preadmission," as he was instructed to do by Mrs. Killian's insurance card.[37] The card said that "[e]mergency admissions must be certified within 48 hours" and that this second number should be used to obtain the necessary "UTILIZATION REVIEW."[38] Taking these facts in the light most favorable to Mr. Killian, a reasonable trier of fact could conclude that Mr. Killian made the second call to obtain the required "certification," or "UTILIZATION REVIEW," for his wife's surgery. Having just learned that the surgical procedure was necessary for his wife to live longer than a few days,[39] a reasonable trier of fact could conclude that Mr. Killian believed this was an emergency procedure for which he was not required to obtain precertification seven days in advance.

---

[37] *Id.* at 73–74.

[38] R.82-7 at 3.

[39] R.253 at 127–28.

### 2. The Second Telephone Call

When Mr. Killian made the second telephone call, he dialed the second, and most prominent, number on the front of Mrs. Killian's insurance card, which was for customer service, as well as for utilization review. As noted earlier, this was the same number listed on the back of the card for utilization review and medical claims. There is evidence that Concert had encouraged beneficiaries to use *this* number for determining provider participation as well. Specifically, in the Master Group Policy, Concert instructed beneficiaries that they "must call the number listed on the *back* of [their] medical identification card" in order "[t]o confirm that … [a] provider is a CURRENT participant in [the beneficiary's] provider Network."[40] The back of Mrs. Killian's insurance card provides two different telephone numbers under three separate headings: the customer service number from the front of the card is provided twice; a vision benefits number is provided once.[41] A beneficiary who seeks to confirm that a hospital is in network by "calling the number listed on the back" of his insurance card must call either the number Mr. Killian called or the number for the "Vision Service Plan," which clearly was inapplicable to the Killians' situation. Therefore, Concert arguably should have known that beneficiaries such as Mr. Killian would be calling this line to determine whether certain providers were in their network.

---

[40] R.259-3 at 15 (emphasis added).

[41] R.82-7 at 3.

Moreover, the second number that Mr. Killian called was the correct, and apparently the only, number that he could call to obtain the required certification review with respect to the particular surgical procedure that his wife was about to undergo. Given his earlier telephone conversation, a reasonable trier of fact certainly could conclude that any further information as to whether the providers were in Mrs. Killian's network would have been provided in the course of this conversation regarding the authorization of the particular procedure.

Indeed, under these circumstances, Concert had an affirmative obligation to inform Mr. Killian that the providers Mrs. Killian was about to see were out of network. *See Kenseth*, 610 F.3d at 466 ("[T]he trustee is under a duty to communicate to the beneficiary material facts affecting the interest of the beneficiary which he knows the beneficiary does not know and which the beneficiary needs to know for his protection in dealing with a third person." (internal quotation marks omitted)). On this record, a rational trier of fact could conclude that this second representative was aware that Mr. Killian's telephone calls were an effort to confirm two points: (1) that the health care providers treating his wife were within the Plan's network; and (2) that the particular procedures contemplated for her care were authorized by the Plan. In this second call, Mr. Killian stated: "I'm trying to get confirmation that we are going to be—my wife is going to be admitted to Rush."[42] The representative laughed, said, "Oh, you mean St. Luke's," and seemed to speak to a person sitting next to her.

---

[42] R.253 at 73.

The second representative then informed Mr. Killian that the hospital is known as "Rush Presbyterian."[43] At some point, Mr. Killian said, "Susan is going to be admitted," and the representative said "[o]kay."[44] From her laughter and attempt at humor, a reasonable finder of fact well might conclude that this second representative knew something about Mr. Killian's prior call. It would be reasonable to infer that this representative knew that Mr. Killian had attempted to determine whether "St. Luke's" was in Mrs. Killian's network during Mr. Killian's prior call to the number for determining provider participation.

It is true that when Mr. Killian called Concert, provided Mrs. Killian's policy number, told Concert where they were and said that Mrs. Killian needed immediate brain surgery, he did not also ask the specific question, "Is Rush an in-network provider?" However, neither the Master Group Policy nor our holding in *Kenseth* requires beneficiaries to ask such a specific question. The Master Group Policy simply told Mr. Killian to call a number on the insurance card, which he did twice. Under *Kenseth*, the fiduciary's duty to provide complete and accurate information, even if the beneficiary does not specifically inquire, is triggered when the beneficiary makes the ERISA fiduciary "aware of the beneficiary's status and situation." 610 F.3d at 466 (internal quotation marks omitted). A rational factfinder could conclude that Mr. Killian put Concert on notice of his status and situation. The first Concert

---

[43] *Id.*

[44] *Id.*

representative's attempt to locate "St. Luke's" suggests that she was aware of his need to determine Rush's network status, and the second representative's comments suggest that she was aware of the earlier call to the network provider number.[45]

_____

[45] The dissent argues that it is impossible for Mr. Killian to ever have called the provider participation line because, it asserts, the only way for the second representative to have had knowledge of Mr. Killian's prior call is if Mr. Killian called the customer service number both times. There are a few problems with this theory.

First, this assumption, while plausible, is not a fact that we can assume in Concert's favor at summary judgment. Concert's vice president of operations testified that "the network" operates the 800 number for determining provider participation, R.115-3 at 200, but he did not testify as to whether Concert and "the network" share facilities or employees and any presumptions must be made in Mr. Killian's favor. Representations made by counsel at oral argument that Concert and PHCS do not share employees and that telephone calls to each line are directed to separate facilities may be true, but on summary judgment counsel's factual assertions at oral argument do not substitute for record evidence.

Second, if we could assume that Mr. Killian is mistaken about which numbers he called and that he did call the same number twice, whether both telephone calls were made to the customer service line or the provider participation line is a fact that must be construed in the light most favorable to Mr. Killian.

Finally, even if we could assume that Mr. Killian called the customer service line both times, a factfinder still could conclude that Concert was on notice of his need for provider network information because, as noted above, the Master Group Policy instructed beneficiaries "[t]o confirm that Your … provider is a CURRENT participant …You must call the number listed on the *back* of Your medical identification card." R.259-3 at 15 (emphasis added). The customer service/utilization review number was the only potentially applicable number on the back of Mrs. Killian's card. After

(continued...)

Nor does the summary judgment record establish that the Killians suffered no harm. It is undisputed that the Killians would have made an appointment with Dr. Bonomi for a second opinion regardless of his network participation status, but two days elapsed between the telephone calls and the actual surgery. A rational finder of fact could conclude that the Killians would have found another hospital or sought emergency admission at Rush had Concert informed them that

---

[45] (...continued)

directing beneficiaries seeking provider information to call "the" number on the *back* of the card, Concert cannot avoid its fiduciary duties by suggesting that Mr. Killian should have called a number on the *front* of the card.

The dissent also argues that Mr. Killian never called to determine provider network status and points to Mr. Killian's deposition where he testified that he told the representative that his wife was being admitted and that he called because he was supposed to call for preadmission. Dissent at 27–31. The dissent argues that because, in his deposition, Mr. Killian said "preadmission" rather than "provider network information," he could not have placed the fiduciary on notice of his need for provider network information.

This view suggests that, contrary to our holding in *Kenseth v. Dean Health Plan, Inc.*, 610 F.3d 452 (7th Cir. 2010), the beneficiary must use the exact terms as defined by the fiduciary before the fiduciary is required to provide information, but the issue is whether Mr. Killian's interaction with the representatives was sufficient to put them on notice of his need for provider network information. Although Mr. Killian used the word "preadmission" in his deposition when telling the attorneys the purpose of his call, he did not testify that he told the representatives that he was calling for preadmission. His interaction with the representatives included calling the designated number, informing the representative of his location and telling the representative of the needed surgery.

Rush was out of network. Concert fails to point to any evidence in support of its assertion that the decision to obtain a second opinion regardless of network status necessarily implies that the Killians would have stayed and had the surgery performed at Rush even if Concert told them that Rush was out of network.[46]

ERISA does not require a fiduciary to set out on a quest to uncover some kind of harm that might befall a beneficiary. But this case requires no such expedition. It simply requires an application of the rule, articulated in *Kenseth*, that an insurance company cannot defeat a breach of fiduciary duty claim by asserting that it was unaware that an insured was seeking certain material plan information when the insured called two different numbers that the insurance company itself established to provide the sort of information in question. This is particularly true when the representatives tell an insured to "go ahead with whatever ha[s] to be done"[47] while knowing (or at least having reason to know) that the insured is confused about this aspect of his plan and is about to undergo a costly procedure that will not be fully covered. We already have held

---

[46] Although Mr. Killian bears the ultimate burden at trial, "[a] party seeking summary judgment bears an initial burden of proving there is 'no material question of fact with respect to an essential element of the non-moving party's case.'" *MMG Fin. Corp. v. Midwest Amusements Park, LLC*, 630 F.3d 651, 657 (7th Cir. 2011) (quoting *Delta Consulting Grp., Inc. v. R. Randle Constr., Inc.*, 554 F.3d 1133, 1137 (7th Cir. 2009)).

Concert deposed Mr. Killian, but never asked whether Mrs. Killian was well enough to travel to a different hospital.

[47] R.253 at 125.

that summary judgment is inappropriate where the "plan documents … failed to explain adequately" a particular provision and the lack of clarity "was then exacerbated by [the fiduciary's agents] when [the beneficiary] inquired about her coverage." *Bowerman v. Wal-Mart Stores, Inc.*, 226 F.3d 574, 591 (7th Cir. 2000). In *Kenseth*, we read *Bowerman* to establish that "by supplying participants and beneficiaries with plan documents that are silent or ambiguous on a recurring topic, the fiduciary exposes itself to liability for the mistakes that plan representatives might make in answering questions on that subject." 610 F.3d at 472 (citing *Bowerman*, 226 F.3d at 591). *Kenseth* further indicated that the principle emerging from *Bowerman* is "*especially true* when the fiduciary has not taken appropriate steps to make sure that ministerial employees will provide an insured with the complete and accurate information that is missing from the plan documents themselves." *Id.* at 472 (emphasis added).[48]

---

[48] The dissent points to *Kenseth* for the proposition that "Concert cannot be liable for a breach of fiduciary duty based on the actions of a non-fiduciary like PHCS," Dissent at 84 n.16, but the *Kenseth* passage quoted is noting that a fiduciary "cannot be held liable on the basis of *respondeat superior*." *Kenseth*, 610 F.3d at 465 (emphasis added). In fact, we have held that a fiduciary can be liable for inaccurate or misleading information provided by a nonfiduciary. *See id.* at 469 (holding that a fiduciary could breach its duty by inviting inquiries and not warning beneficiaries that they could not rely on the advice given by customer service representatives); *Bowerman v. Wal-Mart Stores, Inc.*, 226 F.3d 574, 591 (7th Cir. 2000) (holding a fiduciary liable when inadequacies in the plan documents were exacerbated by incorrect and misleading information from its agents).

## Conclusion

On the denial of benefits claim, we affirm the district court's grant of summary judgment, but remand with directions for counsel for both sides to submit a joint stipulation concerning whether Rush University Hospital, Dr. Barnes and Dr. Bonomi were within Mrs. Killian's provider network. If counsel are not able to agree on a conclusive stipulation, the district court should resolve this issue on remand.[49]

On the breach of fiduciary duty claim, we affirm in part and reverse in part the judgment of the district court. We affirm the district court's grant of summary judgment in favor of Royal Management and Concert with respect to their failure to provide Mrs. Killian with a summary plan description. Consonant with this opinion, we reverse the grant of summary judgment on the breach of fiduciary duty claim with respect to Mr. Killian's telephone call inquiries and remand to permit the trier of fact to determine: (1) whether the telephone calls put Concert on adequate notice, thus giving rise to a duty to disclose material information related to the Killians' situation, (2) whether Concert breached this duty and (3) whether the breach harmed Mr. Killian.[50]

---

[49] This is the result reached by the panel. *Killian I*, 680 F.3d at 764.

[50] On remand, the district court also must address the type of remedy available under ERISA. ERISA provides for equitable relief for breach of fiduciary duty claims, *see* 29 U.S.C. § 1132(a)(3); the Supreme Court recently has suggested that equitable relief can include monetary payments through estoppel and "surcharges," *see CIGNA Corp. v. Amara*, 131 S. Ct. 1866, 1880

(continued...)

On the statutory damages issue, we remand the matter to the district court to permit a recalculation of the award as outlined in the panel's opinion.

We grant Mr. Killian's motion to proceed as administrator of his wife's estate as well as in his individual capacity.

IT IS SO ORDERED.

---

[50] (...continued)
(2011).



UTILIZATION REVIEW REQUIREMENTS CONTACT 1-866-818-3106

- Non-emergency admissions must be precertified no less than 7 days prior to admission.
- Emergency admissions must be certified within 48 hours.
- Non-emergency outpatient surgeries in a hospital or qualified treatment facility require precertification.
  Contact Concert Health Plan for details.
- All hospitals must call to confirm certification of admissions.

Send Medical Claims to:
Concert Health Plan, 2605 W. 22nd St., Suite 25
Oakbrook, IL 60523, 1-866-818-3106

For Vision Benefits call Vision Service Plan, 1-800-877-7195

This card for identification purposes only.

POSNER, *Circuit Judge*, concurring in the judgment. I agree with the outcome, and with much of the analysis in the majority opinion. But I disagree that the obligation at issue in the appeal derives from a fiduciary duty. This is really a breach of contract case, and treating it as such not only is the correct approach but simplifies analysis wonderfully.

But before discussing the merits, I want to say a few words about mootness, the subject of a protracted debate between Judges Ripple and Manion. Both quote the standard formula, repeatedly endlessly in cases, that a case is moot if a judgment on the merits in favor of the plaintiff would not give the plaintiff money or anything else of tangible value. In other words, if something happens in the course of the case that, had it happened before the case was brought, would have required dismissal for lack of standing, the case must be dismissed as moot; the plaintiff has lost standing. But that isn't the actual doctrine. See generally Matthew I. Hall, "The Partially Prudential Doctrine of Mootness," 77 *Geo. Wash. L. Rev.* 562 (2009). A case is not moot, for example, if the defendant voluntarily discontinues the practice that the plaintiff sought to enjoin, but maybe plans to resume it if the suit is dismissed as moot. *United States v. W.T. Grant Co.*, 345 U.S. 629, 632–33 (1953). Or if the plaintiff can never get relief if mootness is a bar, as in a suit to establish a woman's right to an abortion because the suit can't be completed in the nine months between her becoming pregnant and giving birth. *Roe v. Wade*, 410 U.S. 113, 125 (1973). (For the general principle that excepts from the doctrine of mootness orders capable of repetition but evading review, see, e.g., *Southern Pacific Terminal Co. v. ICC*, 219 U.S. 498, 514–16 (1911).) Nor does a class action suit become moot (after the class is certified), because the named plaintiff has settled with the de-

fendant and so no longer has anything to gain from a judgment. *Genesis Healthcare Corp. v. Symczyk*, 133 S. Ct. 1523, 1529–30 (2013); *County of Riverside v. McLaughlin*, 500 U.S. 44, 51–52 (1991).

The reason that mootness is a less strict doctrine than standing is that a case that becomes moot, unlike a case in which there never was standing, is a case that originally was properly before the court, and the court may have made, as it was entitled to make, substantive rulings in the case. "[B]y the time mootness is an issue, the case has been brought and litigated, often (as here) for years. To abandon the case at an advanced stage may prove more wasteful than frugal. This argument from sunk costs does not license courts to retain jurisdiction over cases in which one or both of the parties plainly lack a continuing interest, as when the parties have settled or a plaintiff pursuing a nonsurviving claim has died. … But the argument surely highlights an important difference between the two doctrines." *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 191–92 (2000) (footnote omitted).

When want of standing is detected at the outset of suit, there is no wasted court motion. But mootness by definition is detected later, and there can be a great deal of wasted motion if mootness is equated to an absence of standing and in consequence everything the court has done to date in the case is wiped out. The present case was filed seven years ago. The passage of time has witnessed changes that arguably moot the issue in the case. I think one could argue that when a case is fully adversary until the very end, the precedential value of a decision on the merits would justify carving still another exception to the doctrine of mootness. But

we don't have to go that far in this case. Judge Ripple has presented grounds for regarding Mr. Killian as continuing to have a tangible stake in a favorable judgment. Those grounds are tenuous; but, when the issue is mootness, even a tenuous ground should suffice to avert dismissal.

So on to the merits. The administrator of an employee welfare benefits plan (the type of plan at issue in this case) has a fiduciary duty to the plan's participants "to the extent" that "he has any discretionary authority or discretionary responsibility in the administration of [the] plan." 29 U.S.C. § 1002(21)(A)(iii); see *Pegram v. Herdrich*, 530 U.S. 211, 223–26 (2000); *Baker v. Kingsley*, 387 F.3d 649, 660 (7th Cir. 2004); *Johnson v. Georgia-Pacific Corp.*, 19 F.3d 1184, 1188 (7th Cir. 1994); *In re Citigroup ERISA Litigation*, 662 F.3d 128, 135 (2d Cir. 2011). (Other subsections of ERISA concerning fiduciary obligation, unrelated to this case, focus on financial issues in plan administration. See 29 U.S.C. §§ 1002(21)(A)(i), (ii).)

To call authority "discretionary" is to say that the persons affected by its exercise, such as the plaintiff in this case, have no crisply defined right to limits on that exercise. The plan administrator has been given discretion by the plan to decide for example how much to spend on training his employees, including telephone receptionists who answer participants' questions about coverage. Such decisions, being entrusted to the administrator, are not to be picked apart by appeal to the wisdom of hindsight. The participants' protection from the plan administrator's abusing his discretion lies in the rule that a fiduciary must discharge his responsibilities with the same prudence—trading off costs and benefits with the same care—that he would employ were he a recipi-

ent rather than a provider of such services: he must treat the participants as well as he would treat himself.

There is no evidence of abuse of discretion in this case and thus of a violation of a fiduciary obligation. There was a breach of contract, but not every such breach is a violation of a fiduciary obligation. Liability for breach of contract is strict. The plan administrator may discharge his fiduciary obligations scrupulously, yet if an employee, acting within the scope of his employment, makes a mistake that gives rise to a breach of contract, the mistake and hence the breach will be imputed to the plan administrator by the doctrine of respondeat superior—but without any implication that the administrator committed a breach of trust.

No matter. ERISA authorizes a plan participant to bring a suit "to recover benefits due to him under the terms of his plan," 29 U.S.C. § 1132(a)(1)(B)—benefits in other words that the plan promised. Such a suit treats the plan as a contract. *Herzberger v. Standard Ins. Co.*, 205 F.3d 327, 330 (7th Cir. 2000); *Harlick v. Blue Shield of California*, 686 F.3d 699, 708–09 (9th Cir. 2012). The plaintiff in this case is complaining about a breach of the plan by the claims administrator, an insurance company hired by (and for purposes of appeal indistinguishable from) the plan administrator. The plaintiff seeks "a contract remedy under the terms of the plan." *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 695 (7th Cir. 2010). As that is all he seeks, there is no need, or occasion, to decide whether the plan administrator violated a fiduciary duty.

ERISA preempts breach of contract suits based on state law. 29 U.S.C. § 1144. But all this means is that in an ERISA suit for breach of contract "the relevant principles of contract interpretation are not those of any particular state's contract

law, but rather are a body of federal common law tailored to the policies of ERISA." *Mathews v. Sears Pension Plan*, 144 F.3d 461, 465 (7th Cir. 1998); see also *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 55–56 (1987). Not all American common law is an emanation from *state* courts. When Justice Holmes, protesting against the rule of *Swift v. Tyson* allowing federal courts to apply "general" common law in diversity cases, said that "the common law is not a brooding omnipresence in the sky, but the articulate voice of some sovereign or quasi sovereign that can be identified," *Southern Pacific Co. v. Jensen*, 244 U.S. 205, 222 (1917) (dissenting opinion), he didn't mean that states were the *only* sovereigns that create common law. Just as federal common law governs suits charging breach of federal government contracts, so ERISA's preemption provision makes federal common law govern suits for breach of the terms of ERISA plans.

It's true that in suits to enforce federal government contracts the Supreme Court has told us "to adopt the ready-made body of state law as the federal rule of decision until Congress strikes a different accommodation." *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 691–92 (2006), quoting *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 740 (1979). But that approach isn't possible in this case because ERISA preempts state law in order "to ensure that plans and plan sponsors would be subject to a uniform body of benefits law" and thus "minimize the administrative and financial burden of complying with conflicting directives among States or between States and the Federal Government." *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 142 (1990).

To treat the present case as charging breach of a fiduciary obligation creates uncertainty as to remedy—uncertainty we don't need. ERISA provides only equitable relief to a participant complaining of a violation of such an obligation, 29 U.S.C. § 1132(a)(3)(B); *Mertens v. Hewitt Associates*, 508 U.S. 248, 255–58, 266 (1993); *Kenseth v. Dean Health Plan, Inc.*, 610 F.3d 452, 482 (7th Cir. 2010), whereas all that the plaintiff in this case seeks is simple damages. Monetary relief is sometimes permissible in equitable cases, but why enter that briar patch?

Casting this as a case of fiduciary obligation also creates uncertainty concerning the scope of a plan administrator's duty. How expansive is the fiduciary obligation to inform a plan participant of the differences in the plan's reimbursement for charges by alternative providers of medical treatment? What body of fiduciary law supplies an answer to that question?

And notice that the fiduciary approach arbitrarily and paradoxically bestows greater rights on participants in and beneficiaries of ERISA plans than on beneficiaries of functionally identical insurance plans not governed by ERISA, and even Medicare Advantage plans. What sense does that make?

Analysis of the case as a suit for breach of contract is straightforward. The plan creates a "provider network" of hospitals and other health care providers. A plan participant who obtains treatment within the network is entitled to reimbursement of a much larger fraction of his expenses than if he's treated by an out-of-network provider. The difference in this case, in which expensive surgery was performed in an out-of-network hospital (Rush), was $80,000. Implicitly the

plan administrator was required, when asked, to furnish the participant in a timely manner with an adequate means of determining whether the participant's preferred provider was in or out of the network. To provide this information would not have involved a difficult determination of the scope of coverage, a determination that would have required the receptionist who took the plaintiff's call to interpret the plan. She just had to look up the hospital's name in a database or, if unable to do so, tell the plaintiff where to find the requested information online or in his plan documents. She failed to do this, and the result was that all he had to guide him was a confusing insurance card with multiple phone numbers unclearly labeled as to purpose.

The provider's contractual duty is to furnish requested information in a "timely" manner, lest delay, caused for example by refusing to provide the information orally, prevent the participant from receiving the information in time to act on it. The plaintiff claims that when he told the receptionist that his wife was receiving treatment at "St. Luke's" (Rush-Presbyterian-St. Luke's Medical Center) the receptionist told him to "go ahead with whatever had to be done." She did not tell him that the hospital was not in the provider network. Nor did she tell him where he could find the list of Chicago hospitals that are in the network—indeed, the plaintiff alleges that the list had not been made publicly available.

A contract consists not only of explicit terms but of implicit ones needed to make the explicit terms effective. *Stolt-Nielsen S.A. v. AnimalFeeds 'International Corp.*, 130 S. Ct. 1758, 1775 (2010); *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 607 (7th Cir. 1993) (en banc), *Wood v. Duff-Gordon*, 118 N.E. 214 (N.Y. 1917) (Cardozo, J.); *Restatement (Second) of Contracts*

§ 204 (1981). This is true of ERISA plans in their capacity as contracts. *Singer v. Black & Decker Corp.*, 964 F.2d 1449, 1452–53 (4th. Cir. 1992). Such implicit terms are read into written as well as oral contracts and thus coexist with the requirement that ERISA plans be "established and maintained pursuant to a written instrument," 29 U.S.C. § 1102(a)(1), a requirement that we have called "a long way toward a statute of frauds." *Frahm v. Equitable Life Assurance Society*, 137 F.3d 955, 958 (7th Cir. 1998).

One of the implicit terms in every contract is the duty of good-faith performance. *Denil v. DeBoer, Inc.*, 650 F.3d 635, 639 (7th Cir. 2011); *Market Street Associates Ltd. Partnership v. Frey*, 941 F.2d 588, 593–96 (7th Cir. 1991). It requires the performing party, in this case the plan administrator, to avoid "tak[ing] deliberate advantage of an oversight by your contract partner concerning his rights under the contract." *Id.* at 594. A closely related principle is that "you cannot prevent the other party to the contract from fulfilling a condition precedent to your own performance, and then use that failure to justify your nonperformance." *Ethyl Corp. v. United Steelworkers of America, AFL-CIO-CLC*, 768 F.2d 180, 185 (7th Cir. 1985). The plan in this case saved itself a considerable sum of money because the plaintiff obtained surgery for his wife at a hospital that wasn't in the provider network. The contractual duties that I have just described required the plan administrator to inform the plaintiff of his options if he inquired about them—and he claims he did. If so informed the plaintiff might have decided to move his wife to a hospital in the network. There was time, and it appears that there was at least one hospital in range of Rush competent to perform the surgery. Whether the plaintiff and his wife would have exercised that option is critical to whether he can re-

cover the additional $80,000 that he paid Rush for the surgery. But it is an issue that awaits resolution on remand.

The Supreme Court's decision in *Massachusetts Mutual Life Ins. Co. v. Russell*, 473 U.S. 134 (1985), does not rule conventional principles of contract interpretation out of ERISA and so deny the duty of good faith performance of obligations created by an ERISA plan. It holds only that *extracontractual* damages can't be obtained in a suit for breach of a plan's obligation, whether fiduciary or contractual, explicit or implicit, to process claims in good faith.

Concurring in the *Singer* case cited above, Judge Wilkinson expressed concern that allowing plan participants or beneficiaries to enforce implicit terms in ERISA plans would increase cost and uncertainty. 964 F.2d at 1453. I doubt that. The common law of contracts, a law that enforces implicit contractual terms, is a stable, largely uniform, and generally quite satisfactory body of law. One hears plenty of complaints about the costs and uncertainty entailed by the litigation of other claims, but few about the costs and uncertainty entailed in enforcing claims of breach of contract. Judge Wilkinson cites no evidence in support of his fear that allowing general common law principles to inform litigation over alleged breaches of the terms of ERISA plans will cause "actuarial chaos." *Id*. at 1454. Following his advice would just create pressure for an expansive interpretation of fiduciary obligation, as in the majority opinion in this case—and how is uncertainty reduced by substituting the equitable doctrine of fiduciary obligation for the common law of contracts?

EASTERBROOK, *Circuit Judge*, concurring in part and dis-
senting in part. I agree with the court's unanimous disposi-
tion of the statutory-damages issue and with Part II.A, which
concludes that the controversy is live. I also join Part II.C of
Judge Manion's opinion, which demonstrates that the suit
fails on the merits. I offer two additional thoughts.

First, I agree with Judge Posner that it would be best to
apply contract principles. In *Firestone Tire & Rubber Co. v.
Bruch*, 489 U.S. 101 (1989), the Supreme Court started with
fiduciary principles drawn from trust law because the claims
asserted there involved discretionary decisions by plans' fi-
duciaries. ERISA says that "a person is a fiduciary with re-
spect to a plan to the extent (i) he exercises any discretionary
authority or discretionary control respecting management of
such plan … or (iii) he has any discretionary authority or
discretionary responsibility in the administration of such
plan." 29 U.S.C. §1002(21)(A). The claims in this litigation do
not entail discretion in management or implementation; to
the contrary, plaintiff asserts and the majority holds that
Concert Health lacked discretion. Applying the principles of
contract law, perhaps informed by any specific doctrines de-
veloped in the law of health insurance contracts, would
promote certainty and comparability between health care
provided as a fringe benefit of employment and other medi-
cal coverage.

Second, an approach such as the majority's can make par-
ticipants worse off. They value the opportunity to obtain
prompt oral advice about eligibility for benefits. Some par-
ticipants will lack ready (or any) access to online databases
of providers or description of a plan's benefits. Conditions of
coverage may be hard to understand. See, e.g., *Kenseth v.*

*Dean Health Plan, Inc.*, 722 F.3d 869 (7th Cir. 2013). And printed lists of in-network providers may be bulky and go out of date. Thus oral advice can be a boon to participants.

Yet oral exchanges often are imprecise. The representative must answer off the cuff, often with inadequate information. The participant may misunderstand, misremember, or dissemble about the content of the conversation when, years later, a question arises about who said what. Litigation will be one-sided. James Killian asserts that particular things were said; the representatives at the other end of the phone, even if they could be identified, would not recall the conversations.

Problems of memory and veracity could be addressed by recording everything and keeping the recordings for however long the statute of limitations lasts, though it might be hard to find a particular call in many thousand hours of oral exchanges. But the fact that immediate answers to vague questions will be imprecise, and occasionally inaccurate, cannot be fixed by better record-keeping. Under the majority's approach, any inaccuracy—*and* any failure to be helpful by answering questions the participants should have asked, but didn't—imposes liability on the plan, even if the question is so vague that the telephone representative does not get its gist.

That legal rule will induce some, perhaps many, healthcare plans to take steps for self-protection. One possibility would be to stop giving oral advice. Since that advice can be valuable, and usually is accurate, participants would be worse off. A second possibility would be to give oral advice, pay up when errors occur, and cover that cost by reducing the benefits provided by the plan. Participants might not

welcome that approach either. Still another possibility would be to alert participants that no oral advice could be relied on. A plan might say something like: "Our web site has a database of in-network providers and details about which medical procedures are covered. If the online resource is insufficient, or if you need advance permission for a procedure, you may send us a letter or email; we will answer in writing, and you can rely on that response. We also offer telephonic advice and information but do not warrant its accuracy, and you use it at your own risk." Would this approach help participants? I doubt it. Perhaps my colleagues would hold that ERISA disallows telling participants that they can't rely on oral advice. That would induce plans to close their telephonic hotlines, a step sure to injure participants. Today's decision will push employers and their plans' administrators in that regrettable direction.

MANION, *Circuit Judge*, with whom SYKES, *Circuit Judge*, joins, concurring in part, dissenting in part.

Susan and James Killian were understandably distraught when they learned in early April 2006 that Susan had lung cancer, that it had spread to her brain, and that the brain tumors were inoperable. It is also only natural that their thoughts were focused on Susan's health and finding a doctor able to operate and remove the tumors, and not on the terms of Susan's health insurance plan. And so the Killians did not inquire in advance whether her doctors or Rush University Medical Center were within her health care network; because it turned out that they were not, Susan incurred liability of approximately $80,000 in medical expenses. James believed Concert Health Plan Insurance Company ("Concert") and Royal Management, her employer and the plan administrator, should be liable for those expenses because when he called to inform Concert that Susan was being admitted for brain surgery, the Concert representatives did not inform him that the medical providers were out-of-network. Accordingly, on August 22, 2007, on behalf of Susan's estate, James filed suit against Concert and Royal Management under ERISA for denial of benefits, breach of fiduciary duty, and for statutory damages. In addition to statutory damages, James sought equitable relief in the form of payment for (or a direction to pay), the outstanding medical bills owed the Rush providers.

Over the course of the last six years, the parties, the district court, and this court have expended significant resources exploring the scope of ERISA's fiduciary obligations and the network status of the Rush providers. During that time, the administration of Susan's estate was completed and the estate

was closed and James inherited Susan's rights in this litigation. The court was belatedly notified of this development and the parties did not consider its import, leaving the court to direct the parties to file supplemental briefing on the question of whether the closing of Susan's estate mooted this appeal. In response, James reopened the estate but "solely for the purpose of probating the ERISA clam and prosecuting the claim in the District Court and 7th Circuit Court of Appeals." R.58-2. The issue, though, was never whether James could continue to prosecute Susan's ERISA claims which he inherited in his individual capacity. He clearly could—*if* the relief sought would make a difference to the *legal* interests of the parties. But it won't, at least for the denial of benefits and breach of fiduciary duty claims. Both those claims sought as relief payment of the outstanding medical bills. However, neither Susan nor her estate ever paid those bills. Now that her estate is closed for all purposes except prosecution of this case and the statutory time period for recovering from a decedent (and James for that matter) has passed, there is no longer any liability to the Rush providers. Thus, while an order to pay those bills would benefit third-party non-litigants who no longer have a claim against the estate, i.e., the Rush providers, such relief would not make a difference to the legal interests of Susan's estate, since there is no longer any liability for those medical bills. What we have then is an advisory opinion on the merits of the denial of benefits and breach of fiduciary duty claims because the asserted harm no longer exists. If those claims were not moot, I would agree that remand would be appropriate on the denial of benefits claim, but that, for several reasons, Susan's breach of fiduciary duty claim cannot succeed.

The statutory damages claim, though, remains a live controversy because Susan's entitlement to those damages now resides with James, her beneficiary, and remand on that claim is appropriate. Accordingly, I CONCUR IN PART AND DISSENT IN PART.

## I. BACKGROUND

The *en banc* court recounts the sad facts in this case. In brief, in February 2006, Susan Killian saw her primary care physician because she was suffering from persistent headaches and a severe cold. Her doctor ordered a CT scan, which revealed that Susan had lung cancer that had spread to her brain. She was admitted to Delnor Community Hospital for five days, but was told that her brain tumors were inoperable and she was discharged. Susan and her husband James decided that she should seek a second opinion and they turned to Dr. Bonomi. Dr. Bonomi had previously treated Susan's daughter as well as Susan's fiancé, both of whom unfortunately died of cancer. R. 115-3 at 28, 31.

After her release from Delnor, Susan scheduled an appointment with Dr. Bonomi for April 7, 2006. Dr. Bonomi directed Susan to first meet with a neurosurgeon, Dr. Louis Barnes. Prior to Susan's appointments with Dr. Bonomi and Dr. Barnes, James made no attempt to determine whether the doctors were in the PHCS Open Access Network, which was the network applicable to Susan's health insurance plan with Concert. James testified that he did not know whether Susan

had made any calls or had reviewed the website for a list of network providers[1]. R.115-3 at 30–31, 121.

On April 7, 2006, Susan met with Dr. Barnes and he told her that one of her tumors needed to be removed immediately or she would be dead within five days. Based on Dr. Barnes' prognosis, Susan decided to have the tumor removed. While she was being admitted to Rush Hospital, James telephoned Concert. Although the *en banc* court states that James "first called the 'provider participation' number listed on the front of Mrs. Killian's insurance card," Opinion at 6, as discussed in more detail below, the record does not support that conclusion; rather, the record shows that James placed two telephone calls to Concert's customer service/utilization review number. *See infra* at 79–87. And when asked why he called Concert on April 7, James said *twice* in his deposition that he called Concert to tell them Susan "was going to be admitted to a hospital." R.115-3 at 71–73.

Doctors removed the brain tumor on April 10 and Susan was released from the hospital on April 12, 2006. R.77-5 at 55–56. She received additional outpatient services from Dr. Bonomi and attempted chemotherapy, but could not tolerate it. In June 2006, Susan was admitted to Rush for nine days to be treated for pneumonia. She died two months later.

---

[1] James was not insured under Susan's health insurance policy and was not involved in Susan's decision to enroll in the Concert health care option "SO35 Open Access," which used the PHCS Open Access network. R.115-3 at 15–16, 19–20. James also did not know what information Susan had received upon enrolling in the Concert plan. R.115-3 at 19; 138–139.

After Susan's surgery and prior to her death, Susan began receiving bills from the various Rush providers for outstanding balances related to the brain surgery[2]. In total, the Rush providers continued to bill Susan for approximately $80,000 in medical expenses. Contrary to the court's statement that Concert stated it would not cover services at Rush, Opinion at 8, Concert did not deny Susan coverage for the various services related to her brain surgery at Rush; rather, it paid those claims pursuant to the policy's out-of-network formula. R.115-3 at 263, 270; R.41-18 at 1. In total, Concert paid approximately $17,500 in medical expenses related to Susan's surgery at Rush. R. 41-11 at 1, 2, 7. Moreover, while the providers continued to bill Susan for approximately $80,000-plus in medical expenses, the great disparity between the amount paid by Concert ($17,500) and the remaining amount owed by Susan (approximately $80,000) resulted not from an astonishingly low percentage covered by the insurance company for out-of-network expenses,[3] but from the fact that the out-of-network providers charged a much higher rate for their services than Concert believed was reasonable, that is, the "maximum allowable fee." Specifically, Concert paid out-of-network providers for services rendered based on the Medicare Resource-Based Relative Value Scale. R.77-3 at 22; R.41-18 at 1. And unlike in-network providers, out-of-network providers

[2] Specifically, Susan continued to receive bills from Rush University, University Anesthesiologists, and Chicago Institute of Neurosurgery. R.218-6 at 1.

[3] The Concert policy covered 50% of out-of-network expenses for hospitalizations, subject to the maximum allowable fee. R.259-5 at 3.

had not agreed to accept the insurance company's payment as full payment for services. Rather, out-of-network providers could continue to bill a patient at whatever rate they deemed appropriate, which, in Susan's case, resulted in her owing the Rush providers approximately $80,000.[4]

Susan could have avoided these high out-of-pocket expenses had she opted for better coverage through a different Concert health care plan offered by her employer, namely one which used the PHCS-PPO network. The Rush providers were in-network for the PHCS-PPO network. R.115-3 at 250. But the Concert plan which used the PHCS-PPO network of physicians was more expensive and would have cost Susan approximately 50% more in premiums. R.251 at 51; R.259-3 at 80. Obviously, when she selected the less expensive policy Susan did not know she would soon be diagnosed with late-stage cancer and that her preferred doctors would be out-of-network.

At the time Susan enrolled in the Concert Health Care Plan and selected coverage under the SO35 Open Access option, which used the PHCS Open Access network of providers, she was informed of these reimbursement provisions. Specifically, Susan received an enrollment packet which included, among other things, a Certificate of Insurance, a reminder page, a "frequently asked questions" page, a document summarizing her employment benefits, and her health insurance card (a

---

[4]   After learning of the Killians' situation, Concert did write the Rush providers on Susan's behalf and requested that they not bill Susan for charges above the reimbursement rate. R.77-7 at 11. The Rush providers, though, were not contractually obligated to do so and apparently demurred because they continued to bill Susan for the higher fee amounts.

copy of which is appended to the *en banc* court's opinion). R.259-2–5. The Certificate of Insurance detailed Susan's coverage and, relevant to this appeal, explained in straightforward terms the difference in coverage for in-network and out-of-network providers and that insureds were responsible for any charges above the maximum allowable fee, while stressing that "the choice of provider is Yours." R.77-3 at 5, 11–12. It also explained that insureds could determine the network status of providers by calling Concert or by checking on-line. R.77-3 at 5. Additionally, it stressed the requirement that insureds notify Concert of any hospital admissions for "pre-certification" or "utilization" review, or incur a $1,000 penalty. R.77-3 at 11. And finally, it explained that pre-certification review was a determination of whether a medical service was medically necessary and that "[p]recertification of medical necessity is subject to the limitations, exclusions, and provisions of this certificate … ." R.77-3 at 23.

While the Certificate of Insurance was a comprehensive document, spanning fifty-one pages, the enrollment packet included much more simplified highlights for insureds, including a two-page "Employee Benefit Summary" of the Concert Health Plan. R.259-5 at 2, 3. This summary specified that the SO35 Open Access network was the "PHCS Open Access" network. *Id*. It then summarized the reimbursement rates for various services, both in-network and out-of-network, and informed insureds that: "Non-Network services are subject to Maximum Allowable Fee limitations. The Patient will be responsible for any charges over these limits." *Id*. Another one-page, large-font sheet captioned "REMINDER, PRE-CERTIFICATION IS NEEDED FOR THE FOLLOWING

SERVICES," provided a list of eleven services requiring pre-certification, including "hospital admission." R.259-5 at 9. And a separate one-page handout provided a list of important telephone numbers and website addresses, including both the PHCS webpage and telephone number and the Concert webpage and telephone number. R.259-5 at 7. Finally, a one-page "Frequently Asked Questions" sheet explained that

> Concert Health Plan has partnered with PHCS for your health plan. PHCS is the nation's leading health care network. In order to locate a provider in a specific region of the county, (sic), simply go to the PHCS web site (WWW.PHCS.COM). You will also have an option to print out a "personalized directory" based on the areas for which you are looking for a provider.

R.259-5 at 8. Insureds were also directed "to confirm with the network that the provider is still participating at the location you have chosen" by calling PHCS at 800-242-6679. *Id.*

James, as administrator of Susan's estate, eventually sued Concert, and later, in an amended complaint, added Susan's former employer, Royal Management. The amended complaint alleged three ERISA claims: (1) denial of benefits, (2) breach of fiduciary duty, and (3) statutory damages. The district court granted summary judgment to the defendants on all three claims and James, as administrator of Susan's estate, appealed.

During the pendency of the appeal, Susan's estate was closed and James inherited Susan's lawsuit. James was then substituted in as the plaintiff. R.48-2. This court directed the

parties to file supplemental briefing on the question of whether the closing of Susan's estate mooted this litigation. In response, James reopened Susan's estate "solely for the purpose of probating the ERISA claim and prosecuting the claim in the District Court and 7th Circuit Court of Appeals." R.58-2. He then requested that the court substitute the estate back into the case. R.64-1 at 2.

The *en banc* court, *sua sponte*, deemed James's motion to substitute himself in his capacity as administrator of the estate as a motion to add himself in that capacity, in order to allow James to continue to pursue this litigation both in his individual capacity and as administrator of Susan's estate. Opinion 20 at n.26; Opinion at 40. But whether James is now prosecuting this case in his individual capacity—having inherited the lawsuit—or in his capacity as administrator of Susan's estate, is irrelevant because the underlying claims remain Susan's breach of fiduciary duty, denial of benefits and statutory damages claims.

The court concludes that those ERISA claims are not moot, stating "there is no question that the parties have a current, live dispute with both immediate and potential future conse-quences." Opinion at 17. The court suggests four theories for why there remains a live controversy. First, the court reasons that the estate may have already suffered a concrete and redressable injury by having overpaid some medical bills. Opinion at 17–18. But as discussed below, James never argued such a harm. Opinion at 69–70. Second, the court asserts that since Susan's estate has been reopened, the Rush claims "might be pursued now against the estate." Opinion at 22. This reasoning is wrong for two reasons: (1) Susan's estate has *not*

been reopened for purposes of allowing creditors to file additional claims against the estate, but solely for the purpose of prosecuting this ERISA action; and (2) as James stated in his Supplemental Reply Memorandum: "All claims against the estate are barred by the Illinois Probate Act's two-year limitation period, 755 ILCS 5/18-12(b). … Thus, Rush University and Susan Killian's other providers cannot collect anything from her estate." R.64-1 at 1. The court's third rationale for why this case is not moot, namely that James remains directly and personally liable on Susan's medical bills, is equally misplaced. Opinion at 18. James's purported liability is unrelated to his status as a beneficiary and thus Susan's estate (or James, individually as her beneficiary), cannot pursue the denial of benefits and breach of fiduciary duty claims premised on James's unrelated direct and personal liability. And in any event, James is no longer liable to the Rush providers because the five-year statute of limitations for bringing suit against James under the Illinois Family Expense Act, 750 ILCS 65/15, has long since run. The court's fourth rationale, that "the possibility of meaningful declaratory relief supports an exercise of jurisdiction," is also wrong because there is no declaratory relief that could affect the legal interests of the parties. Accordingly, as discussed below, Susan's estate's denial of benefits and breach of fiduciary duty claims are now moot. The statutory penalty claim, though, is different because that claim entitles Susan's estate to monetary damages, which James, as her beneficiary, inherits and thus that claim is not moot.

On the merits, after concluding that Susan's claims are not moot, the *en banc* court adopts, in part, the panel decision in

*Killian v. Concert Health Plan (Killian I),* 680 F.3d 749 (7th Cir. 2012). In the panel decision in *Killian I,* the court affirmed the district court's grant of summary judgment for Royal Plan and Concert on the denial of benefits claim, but required the parties to stipulate concerning whether the Rush providers were in the PHCS Open Access network. *Id.* at 756 n.5. The panel also affirmed summary judgment on the breach of fiduciary duty claim, but reversed and remanded the statutory damages claim because the district court erred in calculating the penalty and failed to address one of James's arguments. *Id.* at 762–64. The *en banc* court "adopt[s] the panel's reasoning and conclusion related to the denial of benefits and statutory penalties issues." Opinion at 3. The *en banc* court also agrees with the panel that Royal Plan and Concert were entitled to summary judgment on James's claim that the defendants breached their fiduciary duty by failing to provide Susan with a summary plan description, because James could not show that the lack of a summary plan description caused any harm. Opinion at 13. However, the *en banc* court holds that reversal on the breach of fiduciary duty claim is appropriate because a rational finder of fact could conclude that Concert had a fiduciary duty to inform James that the Rush providers were out-of-network during the April 7, 2006 telephone conversations; that it breached that duty; and that that breach resulted in harm to James. Opinion at 39.

If Susan's breach of fiduciary duty claim was not moot, the defendants would nonetheless be entitled to summary judgment on the merits. A breach of fiduciary duty claim premised on the April 7, 2006, telephone calls fails, first because James waived any argument that the defendants breached their fiduciary duty by not informing him, when he called, that the

providers were out-of-network. And the defendants did not waive this waiver. Second, even if this theory had not been waived, there was no breach of fiduciary duty because James did not put Concert on notice that he was inquiring on the providers' network status as in-network or out-of-network providers. Accordingly, even if this claim is not moot, the district court's decision granting the defendants summary judgment on the breach of fiduciary duty should be affirmed. The denial of benefits claim is likewise moot, but if it were not, at this stage remanding to allow the parties to submit a stipulation concerning the Rush providers' network status seems most expedient. If they are unable to do so, the district court should resolve the dispute. Finally, I agree that remand on the statutory penalty claims is appropriate, as the panel decision held and as adopted by the *en banc* court.

## II. DISCUSSION

A.  Susan's breach of fiduciary duty and denial of benefits claims are moot because the Killians never paid the Rush providers and there is no longer a legal obligation to pay those bills. Thus, there is no longer any legal harm to Susan's estate.

Article III, § 2 of the Constitution grants federal courts the authority to adjudicate only "actual ongoing controversies." *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 626 (7th Cir. 2007) (quoting *Honig v. Doe*, 484 U.S. 305, 317 (1988)). "For a case to be justiciable, a live controversy must continue to exist at all stages of review, not simply on the date the action was initiated." *Brown v. Bartholomew Consol. School Corp.*, 442 F.3d 588, 596 (7th Cir. 2006). Thus, "[i]t has been

firmly established that an appeal should be dismissed as moot when, by virtue of an intervening event, a court of appeals cannot grant any effectual relief whatever in favor of the appellant." *A.B. ex rel. Kehoe v. Hous. Auth. of South Bend*, 683 F.3d 844, 845 (7th Cir. 2012) (internal quotation omitted). Moreover, "[a]lthough neither party has urged that this case is moot, resolution of the question is essential if federal courts are to function within their constitutional sphere of authority." *North Carolina v. Rice,* 404 U.S. 244, 246 (1971). Accordingly, "mootness, like standing, is always a threshold jurisdictional question that we must address even when it is not raised by the parties." *Wernsing v. Thompson,* 423 F.3d 732, 745 (7th Cir. 2005) (internal quotation omitted).

Under this framework, Susan's denial of benefits and breach of fiduciary duty claims are moot. At the time that James, as administrator of Susan's estate, filed suit, Susan's estate allegedly owed approximately $80,000 in medical bills to the Rush providers. *Killian I*, 680 F.3d at 758. Since then, Susan's estate had been closed. Actually, Susan's estate had been closed in August 2011—prior to both the oral argument and the release of the panel's decision in *Killian I*—but the court was not informed of this development until September 2012, when James filed a motion to substitute himself as plaintiff. R.48-2. In that motion, James explained that the only asset of Susan's estate was the underlying ERISA claim, that Susan's estate had been closed, and that that asset had been transferred to him. Attached to that motion were the state court orders confirming these facts. *Id*. This court granted the motion and substituted James as the plaintiff.

Based on these developments, this court directed the parties to file supplemental briefing on the question of whether the closing of Susan's estate mooted this litigation. Specifically, the court directed the parties to discuss "with particularity whether Mr. Killian retains any interest in obtaining relief and whether the relief sought by Mr. Killian will make a difference to his legal interests." R.53. In response, James reopened Susan's estate "solely for the purpose of probating the ERISA claim and prosecuting the claim in the District Court and 7th Circuit Court of Appeals." R.58-2. He then requested that this court substitute the estate back into the case. R.64-1 at 2. The court deemed this a request to add him in his capacity as administrator of Susan's estate, leaving James to pursue this litigation in that capacity and in his individual capacity. Opinion 20 at n.26; Opinion at 40.

The court asserts James's reopening of the estate resolves the mootness question because the unpaid medical bills "might be pursued now against the estate." Opinion at 22. According to the court: "In light of the reopening of the estate, the contention in Judge Manion's dissent … that there is no possibility of recovery of the medical bills from the estate, and therefore no apparent harm to the estate, is not demonstrably correct." Opinion at 20. But the estate was reopened "solely for the purpose of probating the ERISA clam and prosecuting the claim in the District Court and 7th Circuit Court of Appeals." R.58-2. Thus, the estate is not open for purposes of allowing third-party creditors, such as the Rush providers, to seek recovery from the estate for medical expenses.

Nor is there any possibility that the Rush providers could still reopen the estate and recover on the unpaid medical bills.

As James stated in his Supplemental Reply Memorandum: "All claims against the estate are barred by the Illinois Probate Act's two-year limitation period, 755 ILCS 5/18-12(b) … Thus, Rush University and Susan Killian's other providers cannot collect anything from her estate." R.64-1 at 1. James is correct. Section 18-12(b) provides that "[u]nless sooner barred under subsection (a) of this Section, all claims which could have been barred under this Section are, in any event, barred 2 years after decedent's death, whether or not letters of office are issued upon the estate of the decedent." 755 ILCS 5/18-12(b). "The filing of a claim within the period specified by section 18-12 is mandatory." *In re Estate of Hoheiser*, 424 N.E.2d 25, 28 (Ill. App. Ct. 1981). And the failure to file a claim within this statutory period is a bar to recovery, even if the executor had personal knowledge of the claim. *Id.* Further, "where a legal claim should have been, but was not, filed against an estate within the statutory period, relief will not be accorded by the application of equitable principles." *In re Estate of Ito*, 365 N.E.2d 1309, 1311 (Ill. App. Ct. 1977). In short, "[n]o exception to the filing period may be engrafted by judicial decision." *Id.* In fact, "[a] probate court *cannot* authorize an administrator to pay a claim after the claim has been barred from payment under the statute. To authorize payment under these circumstances would in effect nullify the provision in the statute." *Messenger v. Rutherford*, 225 N.E.2d 25, 94 (Ill. App. Ct. 1967) (internal citation omitted).

In this case, Susan died in August 2006 owing the Rush providers approximately $80,000 in unpaid medical bills. Susan, though, never paid those medical expenses and Illinois's two-year limitations period now bars any attempt by the

Rush providers to reopen and collect on those unpaid bills[5]. Without exception. *See supra* at 68. And the probate court lacks authority even to authorize James, as administrator, to pay those claims. Accordingly, there is no possibility that Susan's estate remains liable on the unpaid medical bills.

The court also reasons that this case is not moot because the estate has already suffered a concrete and redressable injury, namely that the Killians were injured by overpaying medical bills representing co-pay, coinsurance, and annual deductible amounts, which would have been lower had the services been obtained from an in-network provider. Opinion at 17–18. However, James has *never* claimed, including in his response to the court's request for supplemental briefing, that they overpaid any of the medical providers because of the defen-

---

[5] The court relies on *Schloegl v. Nardi (In re Estate of Perrine)*, 234 N.E.2d 558, 561 (Ill. App. Ct. 1968), for the proposition that "[i]n Illinois, the fact that an estate is closed may, but does not necessarily, preclude creditors from bringing claims against it." Opinion at 20-21. The court notes that subsequent cases have distinguished *Schloegl*, but that none of those cases "rejected its conclusion that a claim may be brought against an estate if the time for bringing such claims has not expired." Opinion at 21. *Schloegl* is not relevant to the case at hand because *Schloegl* involved a claim brought within both the governing statute of limitations and the probate's limitation period. But in this case, the Rush providers did not file a claim within the probate act's two-year limitations period, as required by Section 18-2. Illinois law is clear that Section 18-2 "imposes *additional* time constraints for making certain claims against a decedent's estate." *Vaughn v. Speaker*, 533 N.E. 2d 885, 888 (Ill. 1988) (emphasis in original). And a "court has no power or jurisdiction to entertain a petition against an estate after the statutory period has passed." *In re Marriage of Epsteen*, 791 N.E.2d 175, 185 (Ill. App. Ct. 2003).

dants' purported ERISA violations. Rather, James has *always* maintained that the harm Susan's estate suffered as a result of the breach was that Susan incurred about $80,000 in unpaid medical bills.

The court's third rationale for why this appeal is not moot is that "Mr. Killian's financial affairs are burdened with real uncertainty. …" Opinion at 22. Here, the court notes that there is a "sufficiently real possibility that the additional debts may come Mr. Killian's way," Opinion at 20, and finds "Mr. Killian's personal liabilities on Mrs. Killian's debts" relevant. Opinion at 24 n.28. There are two problems with this reasoning.

First, Susan's estate brought this litigation to obtain relief on Susan's ERISA claims. The court acknowledges that the claim is "*Mrs. Killian's* claim," but adds that James "inherited it, and, in any event, the consequence of the resolution of the dispute, whatever it may be, falls to him alone." Opinion at 19. But James did not inherit Susan's obligation to pay Rush; Susan's estate never paid those bills; and those debts did not reduce the assets that James inherited—there were none. Thus, the alleged harm did not somehow flow to James as part of the probate process.

What the court is doing is conflating the legal interests of Susan's estate (which James inherited), and James's unrelated individual interests, reasoning that "the dispute in this case *always has been* one between Mr. Killian and the defendants over his wife's coverage and their family's resulting liability on third-party medical debts." Opinion at 18. While the dispute underlying this litigation may have always been one between

James and the defendants,[6] the litigation has always been between Susan's estate and the defendants. Or as the court explained "[t]he estate is and has always been a construct to resolve this dispute." Opinion at 19. Accordingly, only those harms which an estate may litigate are relevant. This is a question of standing which concerns the fundamental constitutional limits of this court. *Perry v. Sheahan*, 222 F.3d 309, 313 (7th Cir. 2000).

What then are the harms an estate may litigate? The administrator of an estate may prosecute claims on behalf of a deceased plaintiff's estate which ultimately benefit "the heirs and any other claimants to the estate, such as his creditors." *See Anderson v. Romero*, 42 F.3d 1121, 1123 (7th Cir. 1994). It is true that should the estate prevail on the denial of benefits and breach of fiduciary duty claims, James, who is the estate's beneficiary, will benefit. But he will not benefit as a beneficiary. This point is clear if one considers what would happen if James were not a beneficiary of Susan's estate. James's purported liability for the medical expenses due the Rush providers is based on the Illinois Family Expense Act. The Illinois Family Expense Act provides that spouses are jointly and severally liable for each other's medical expenses whether or not they are living together or separately. *Mercy Ctr. for Health Care Serv.*

---

[6]   In stating that the dispute in this case has always been between James and the defendants, the court incorrectly posits that "the creditors appear to have pursued the path of least resistance and billed Mr. Killian directly." Opinion at 18–19. There is no evidence in the record, though, to support this assumption; in fact, all of the bills, and later the various demand letters from collection agencies, were addressed to Susan Killian, not James. *See, e.g.,* R.77-4, R.77-3 at 59.

*v. Lemke*, 557 N.E.2d 943, 963–63 (Ill. App. Ct. 1990). If James were not a beneficiary or heir of Susan's estate (maybe because of a divorce subsequent to the provision of medical expenses), James would still "benefit" by the estate obtaining an order to pay the Rush providers given that he would have joint liability under the Act. But the benefit to James would not be because of his status as a beneficiary of the estate. Thus, the court is wrong to rely on "persisting uncertainties concerning the future liability of the estate *and* its beneficiary" to find this case not moot, Opinion at 24, because there is no future liability of James *qua* beneficiary. And the court's other explanation for why the estate can seek a remedy for a direct and personal harm to James, namely that James stands before this court as "husband," is incorrect. Opinion at 20 n.26. James may now stand before this court in his individual capacity, but the claims remain Susan's underlying breach of fiduciary duty and denial of benefits claims. *Id.*[7]

The statutory penalty claim is a different matter. That claim allows for monetary damages. Consequently Susan's estate (and James individually) can continue to litigate that claim on behalf of James because as a beneficiary James is entitled to receive those statutory damages.

---

[7] A more difficult question is whether an estate has standing to litigate a breach of contract claim solely for the benefit of a third-party beneficiary of that contract. The defendants argue that James is not a beneficiary of the Concert Health Plan and therefore the estate cannot litigate on his behalf. The court, though, does not rely on a third-party beneficiary theory to justify the estate's standing to litigate a purported harm to James. And such a theory surely would not extend to a breach of fiduciary duty claim.

The entire premise that there is a "sufficiently real possibility that the additional debts may come Mr. Killian's way" is also wrong. In response to this court's request for supplemental briefing, James identified only one basis for personal liability—the Illinois Family Expense Act, 750 ILCS 65/15, which as noted above creates joint and several liability for spouses' medical expenses. Because the Illinois Family Expense Act does not have its own statute of limitations, the catch-all five-year limitation period applies. *See* 735 ILCS 5/13–205 (2010); *Pope v. Kaleta*, 234 N.E.2d 109, 114 (Ill. App. Ct. 1967). Susan's brain surgery at Rush occurred in April 2006 and yet the Rush providers have not initiated litigation against James, so, now—2013—any claims by them against James would be time-barred. Thus, any liability, and in turn harm, that James might have suffered no longer exists[8]. Accordingly, even if it were appropriate to consider a harm to James in assessing whether Susan's estate's denial of benefits and breach of fiduciary duty claims are moot, there is no such harm to James.

James may well wish that the Rush doctors receive additional compensation for their services and may desire vindication for the wrong he perceives. But the test for mootness "is whether the relief sought would, if granted, make a difference to the legal interests of the parties (as distinct from their psyches, which might remain deeply engaged with the merits

---

[8] The court notes that limitations periods may be tolled "if the party to be charged makes a partial payment, or new written promise to pay." Opinion at 21–22 (citations omitted). James turned over during discovery the documents related to the unpaid Rush bills. These documents showed no partial payments and no written promise to pay.

of the litigation)." *Air Line Pilots Ass'n, Int'l v. UAL Corp.*, 897 F.2d 1394, 1396 (7th Cir. 1990). And in this case, the relief sought, namely payment of the outstanding medical bills, no longer makes a difference to the legal interests of Susan's estate because the estate is not liable for the outstanding medical bills; the Rush creditors no longer have a right to payment from the estate; and James is no longer liable to the Rush providers.

Finally, the court reasons that this case is not moot because of "the possibility of meaningful declaratory relief … ." Opinion at 23. The court, though, does not explain what such relief would be, other than suggest that it could be something that relieves James of his personal liabilities on Susan's claims. Opinion at 24 n.28. But as discussed above, the estate cannot seek relief in favor of James for his direct and personal liability and in any event there is no such potential liability. Thus, there is no declaratory relief for the purported denial of benefits and breach of fiduciary duty claims that could affect the legal interests of Susan's estate, its creditors, or its beneficiary *qua* beneficiary.[9]

In sum, Susan's estate sued the defendants alleging a denial of benefits and breach of fiduciary duty under ERISA, asserting as the harm unpaid medical bills totaling approximately $80,000. But now there is no remaining liability on those claims

---

[9] I believe the record makes clear that these claims are moot. However, if there were any question of mootness, the appropriate course of action would be to remand to the district court for the record to be clarified on the question of mootness, without the court addressing the merits of the claims. *See Rice*, 404 U.S. at 248.

for Susan's estate, for creditors, for James *qua* beneficiary, or even for James individually. These facts moot Susan's estate's claim because "there is no possible relief which the court could order that would benefit the party seeking it." *In re River West Plaza-Chicago, LLC*, 664 F.3d 668, 671 (7th Cir. 2011) (internal quotation omitted) (emphasis added). This court has held claims pending on appeal are moot in analogous situations. For instance, when a restitution order was paid by another party while the appeal was pending, this court held that the appeal was moot because "[w]e cannot relieve [a party] of an obligation that has already been extinguished by another party." *United States v. Balint*, 201 F.3d 928, 936 (7th Cir. 2000). *See also Wegscheid v. Local Union 2911, Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am.*, 117 F.3d 986, 990 (7th Cir. 1997) ("[A] suit cannot be maintained in a court created under Article III of the Constitution, however egregious the defendant's conduct, unless the decision would affect the tangible interests of the suit. A decision of this appeal, given that the suitors have obtained all the relief that *they* need to protect themselves … could not have such an effect.") (emphasis in original). Here, the obligation to pay has been extinguished by operation of law and not by an act of another party, but the end result is the same. There is no longer a legal obligation to pay and thus a court order would not bestow on Susan's estate, its creditors, or its beneficiary *qua* beneficiary, a legal benefit. *See Stevens v. Hous. Auth. of South Bend, Ind.*, 663 F.3d 300, 306 (7th Cir. 2011) ("A case is moot when a plaintiff no longer has a legally cognizable interest in the outcome."). Accordingly, the denial of benefits and breach of fiduciary duty claims are now moot, but the statutory penalty claim

remains a live controversy because it allows for money damages.

> B. James waived any breach of fiduciary duty claim premised on the two April 7, 2006, telephone calls to Concert and the defendants did not waive that waiver.

Before the district court, James argued that the defendants had breached their fiduciary duty to him by failing to provide a summary plan description. The district court granted the defendants summary judgment on this claim. James then filed a motion to reconsider, arguing for the first time that the defendants also breached their fiduciary duty by not informing him of the out-of-network status of the Rush providers during his April 7, telephone conversations with Concert. The district court denied James's motion to reconsider, holding that it was too late to raise an argument premised on the April 7 telephone conversations.

By not presenting a timely argument to the district court premised on the April 7 telephone calls, James waived any argument that the defendants breached their fiduciary duty based on those telephone calls. *Publishers Res., Inc. v. Walker-Davis Publ'ns, Inc.*, 762 F.2d 557, 561 (7th Cir. 1985) (holding that a litigant who fails to raise an argument in opposition to a properly raised motion for summary judgment will not be permitted to raise that same argument later, either in a motion for reconsideration or on appeal). The *en banc* court, though, holds that the defendants waived James's waiver by failing to

assert waiver in this court[10]. Opinion at 11 n.22. But the defendants had no reason to assert waiver in this court because James did not develop a breach of fiduciary duty argument in his appellate briefs premised on the April 7 telephone calls. Therefore, the defendants did not waive Killian's waiver.

Moreover, while a party can waive a waiver by failing to raise it, the waiver doctrine is "designed for our own protection as much as that of an opposing party, and therefore need not be asserted by a party for us to invoke it." *United States v. Hassebrock,* 663 F.3d 906, 914 (7th Cir. 2011). This case presents such a circumstance—one where, even if the defendants are deemed to have not asserted waiver, the court should. James litigated this case for years before the district court and never developed a breach of fiduciary duty argument premised on the two telephone calls to Concert. Consequently, neither James nor Concert developed the record concerning those telephone calls. And not only did the parties not develop the record concerning those telephone calls, they did not identify for the court the relevant portions of the record related to those telephone calls. This appeal involves a record of over 4,000 pages and the only way this court can properly and fairly address a breach of fiduciary duty claim premised on those two telephone calls is for the court—without the aid of the parties—to tediously sift through the record to understand

---

[10]  Contrary to the court's assertion that the panel had originally found no waiver, Opinion at 11 n.22., *Killian I* bypassed the issue of waiver because Killian lost on the merits of his claims. *See Killian I,* 680 F.3d at 757–58 (stating "we will bypass the waiver issue altogether and will address both of James's arguments only on the merits").

exactly what happened (or rather, what inferences the record could reasonably support). That review, as discussed at length below, leads me to conclude that even absent waiver, James cannot prevail on a breach of fiduciary duty claim premised on the two telephone calls. But this court should not undertake such a review in the first instance and should hold James to his waiver.

C. James cannot prevail on a breach of fiduciary duty claim premised on the two April 7, 2006, telephone calls to Concert because James made both calls for pre-certification of Susan's hospital admission and not to inquire on the network status of the Rush providers. And the enrollment packet Susan received clearly informed insureds of the reimbursement rates for out-of-network providers and how to inquire on a provider's network status. Further, nothing James said to the Concert representatives put them on notice that he was concerned about the Rush providers' network status. Accordingly, Concert did not have a fiduciary duty to inform James that the Rush providers were out-of-network.

Even if Susan's breach of fiduciary duty claim were not moot, the claim fails on the merits. "A claim for breach of fiduciary duty under ERISA requires the plaintiff to prove: (1) that the defendant is a plan fiduciary; (2) that the defendant breached its fiduciary duty; and (3) that the breach resulted in harm to the plaintiff." *Kenseth v. Dean Health Plan, Inc.*, 610 F.3d 452, 464 (7th Cir. 2010). The *en banc* court holds that a reason-

able finder of fact[11] could find that the defendants breached their fiduciary duty to Susan by not informing James that the Rush providers were out-of-network and that this breach of duty harmed James. Opinion at 36–37. For the reasons detailed below, I disagree.

>    1. James did not call the PHCS dedicated provider participation telephone number on April 7, 2006. Rather James called Concert twice at the same number, which was listed three times on Susan's insurance identification card, twice for utilization review and once for customer service.

The *en banc* court notes that to review Susan's breach of fiduciary duty claim the court must focus on the two April 7, 2006 telephone calls, Opinion at 28, so I begin there as well.

In discussing the first telephone call James made on April 7, 2006, the *en banc* court states that James called the "provider participation" number listed on the front of Susan's insurance card.[12] Opinion at 6. The panel decision also assumed that to be

---

[11]  Because § 502(a)(3) authorizes only "equitable relief" there is no right to a jury trial. *McDougall v. Pioneer Ranch Ltd. Partnership*, 494 F.3d 571, 576 (7th Cir. 2007); *Nat'l Sec. Sys., Inc. v. Iola*, 700 F.3d 65, 79 n.10 (3d Cir. 2012); *Cox v. Keystone Carbon Co.*, 861 F.2d 390, 393 (3d Cir. 1988).

[12]  The *en banc* court also states that "[T]he Killians did not contact Concert before meeting with Dr. Bonomi *because* their plan to see Dr. Bonomi for a second opinion did not depend on whether he was in Mrs. Killian's network." Opinion at 6 (emphasis added). James, though, did not testify *why* he had not contacted Concert before Susan's appointment, and, in fact, stated that he did not know whether or not Susan had contacted Concert or

(continued...)

the case, while noting that no matter which number James called, there was no breach of fiduciary duty. *Killian I*, 680 F.3d at 759. But, as discussed below, by inferring that James called the PHCS dedicated provider number, both the panel decision and the *en banc* decision reflect a misunderstanding of the record, which is understandable given that James waived the argument and the parties never briefed the issue or provided record support for their differing views on which telephone number James called.

Contrary to the panel decision and the *en banc* court's conclusion today, the record does not support a *reasonable* inference that James called the PHCS dedicated provider participation number. In fact, in his Rule 56.1 Statement of Facts, James never claimed he called the PHCS dedicated provider line, but merely stated he "called one of the 800 numbers on the card" and that he "called another number on Susan's insurance card." R.266 at 2. Nor did James claim in his affidavit that he first called the dedicated provider line, stating instead: "I called one of the 800 numbers on the card." R.266-2 at 2. Then, in his deposition testimony, James first testified: "[t]here were two numbers on the medical card. I believe one was for—I believe one of them was for determination of eligibility of benefits and one was for admittance or a customer service number. So I believe I called the customer service number first and later on I called back … ." R.115-3 at 71-72. As the deposition continued, though, when asked again about the

---

[12] (…continued)
reviewed the network provider list on the Concert website prior to meeting with Drs. Barnes and Bonomi. R.115-3 at 30–31, 121.

telephone calls, and specifically which number he called first on April 7, James stated "I believe it was the top number," the [800-242]-6679 number[13]. R.115-3 at 117–18. (The number at the very top of the card is the PHCS dedicated provider participation number.) And that when he called the second time he "believe[d] it was the second number," the customer service number, 866-818-3106. R.115-3 at 118.

James's deposition testimony was thus contradictory concerning which number he initially called on April 7. This contradiction is not fatal to James's case, given that this is summary judgment and the record must be viewed in the light most favorable to the non-moving party. But it does show that James is unclear about what number he actually called on April 7, which is most likely why he did not assert in his Rule 56.1 Statement of Facts that he called the PHCS dedicated provider line. R. 266 at 2.

While James's uncertainty might not doom his case, his testimony about the telephone calls makes clear that it was impossible for him to have first called the PHCS dedicated provider-line number. Specifically, in explaining in his deposition what transpired on April 7, James stated that when he called back the second time, "I talked to a woman named Maria and I said something about, 'I'm trying to get confirmation that we are going to be—my wife is going to be admitted to Rush.' Again, I said—she just said, like she knew who I was, she said, 'Oh, you mean St. Luke's,' and she laughed and she

---

[13] The deposition transcript reads "824-6679," R.115-3 at 118, which is presumably a typographical error because the card lists the number for PHCS as 242-6679.

sounded like she was talking to the person next to her. That there were two different phone numbers but they were sitting next to each other. I believe they were 800 numbers. She said, 'You mean Rush Presbyterian.'" R.115-3 at 72. James reiterated this point in his affidavit, stating when he called back the second time, "[w]hen Maria heard me say 'St. Luke's' she laughed and said to a colleague, 'It's the guy from St. Luke's.'" R.87 at 2.

It is impossible for this scenario to have transpired as James recounted if he had called the PHCS dedicated provider line because, as the record establishes, Concert does not run the dedicated provider line. The PHCS network does. R.115-3 at 200. The only way for the second operator to quip to the co-worker sitting next to her that it was the guy from "St. Luke's" would be if James had called the Concert number both times, and in the interim, the two Concert representatives were discussing James's first call. And the number for Concert was listed on Susan's insurance identification card three times, twice on the front of the card, once for customer service and once for utilization review, and once on the back of the card for utilization review. Thus, given James's own testimony, it was impossible for James to have first called the PHCS line dedicated to determining provider participation status. He must have instead called Concert both times.

Admittedly, the record is not well developed on this point and for a very simple reason: James never claimed that he called to determine Rush's network status and instead testified expressly and clearly in his deposition that he called to inform

Concert that Susan was being admitted to the hospital[14]. *See infra* at 87–92. And James never developed a breach of fiduciary duty claim before the district court premised on these telephone calls; his mention of them in his appellate briefs was also fleeting. Accordingly, there was no reason for Concert to develop an argument about these telephone calls, to conduct further discovery concerning the telephone calls, or to point the court to the portions of the record related to these telephone calls and the management of the dedicated provider line by PHCS. Thus, James's waiver prejudiced Concert because it could have sought additional discovery, which might more clearly negate James's current argument that he called the PHCS dedicated provider line to determine Rush's network status.[15]

---

[14] The court states that while James used the word "preadmission" in his deposition when telling the attorneys the purpose of his call, he did not testify that he told the representatives that he was calling for preadmission." Opinion at 36 n.45. The court then states that the interaction with the representatives included "informing the representative of his location and telling the representative of the needed surgery." Opinion at 36 n.45. It is true that James never testified that he used the technical term "preadmission" when talking to the representatives. But he did testify that he told them: "Susan is going to be admitted"; "I'm trying to get confirmation that we are going to be—my wife is going to be admitted to Rush"; "she is going—they want to admit her because we already determined the tumor had to come off"; "I said she was being admitted to the hospital and they were going to do the surgery … Brain surgery." R.115-3 at 71–72, 124.

[15] For instance, during James's deposition, the defendant's attorney asked where he made the two telephone calls from, ascertained they were made from a cell phone, that James still uses that cell phone, and confirmed the

(continued...)

In fact, this entire discussion aptly illustrates why the
waiver doctrine is also designed for the court's own protection.
Throughout the panel and *en banc* decisions, the opinions
contradictorily state that James's first call on April 7 was to
Concert and to the dedicated provider line. *See Killian I*, 680
F.3d at 752, 757, 759–60; Opinion at 6, 29, 34–35. But if the first
call was made to the PHCS dedicated provider line, then the
first call could not have been made to Concert because, as the
record *does* establish, the PHCS network operates the 800
number that individuals can call to determine if a provider is
in the caller's network[16]. R.115-3 at 200.

The *en banc* court sidesteps the issue by stating that Concert
has never disputed the fact that James's first call was to the
dedicated provider line and the second call was to the Concert

---

[15] (...continued)
carrier. R.115-3 at 152–53. The defendants could have subpoenaed the
telephone records to confirm the telephone number James called on April
7, 2006, but never did. But they had no reason to do so because James never
claimed that he called to determine network status or that the telephone
calls served to establish a separate breach of fiduciary duty claim. The
defendants could also have attempted to obtain an affidavit from the
representatives who fielded James's calls to further establish that they came
into the same call center.

[16] Concert cannot be held liable for a breach of fiduciary duty based on the
actions of a non-fiduciary like PHCS. *See Kenseth*, 610 F.3d at 465 (explaining
that "[f]inding that plan administrators may breach a fiduciary duty
vicariously through the actions of a non-fiduciary would vitiate our
requirement that an ERISA claim for breach of a fiduciary duty must be
asserted against plan fiduciaries") (internal quotation omitted).

customer service line. Opinion at 7 n.17. But Concert did. During oral argument, Concert's counsel stated that James did not call the dedicated provider line number. The *en banc* court challenged the attorney on this point several times, and after realizing the *en banc* court's confusion, Concert's attorney explained why, given James's testimony, it was impossible for James to have called the dedicated provider-line number: Concert and PHCS Network are two distinct entities, each with separate 800 numbers, separate physical locations, and different employees. Because this was never an issue before, Concert never raised it before. And because in his Rule 56.1 Statement of Facts James never asserted that he had called the dedicated provider line, there was nothing to dispute. R.266 at 2.

Our review of summary judgment orders requires us to view all *reasonable* inferences in the light most favorable to the non-moving party. But "if the factual context renders the claims asserted by the party opposing summary judgment implausible, the party must 'come forward with more persua-sive evidence to support their claim than would otherwise be necessary.'" *McDonnell v. Cournia,* 990 F.2d 963, 967 (7th Cir. 1993) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). The factual context laid out above renders James's recollection of first calling the dedicated provider line impossible. Rather, given his testimony, James must have called the same Concert customer service/utilization number twice on April 7.[17]

---

[17] The court responds that the record does not establish whether Concert
(continued...)

The court incorrectly assumes that James first called the PHCS dedicated provider line. And that assumption is the lynchpin to the *en banc* court's conclusion that a reasonable finder of fact could find the defendants had a fiduciary duty to inform James that the Rush providers were out-of-network. *See* Opinion at 28 ("Because this line was dedicated to informing beneficiaries whether providers were in network, Concert knew (or at the very least, should have known) that beneficiaries would call this line to determine a provider's network status."); Opinion at 33 ("Given his earlier telephone conversation, a reasonable trier of fact certainly could conclude that any further information as to whether the providers were in Mrs. Killian's network would have been provided in the course of this conversation regarding the authorization of the particular procedure."); Opinion at 34 ("It would be reasonable to infer that this [second] representative knew that Mr. Killian had attempted to determine whether 'St. Luke's' was in Mrs. Killian's network during Mr. Killian's prior call to the number for determining provider participation."); Opinion at 35 ("[T]he second representative's comments suggest that she was aware of the earlier call to the network provider number."). But because the record does not support a reasonable inference that James called the dedicated provider line, that cannot serve as a basis for inferring that James was calling to determine the network status of the providers. And as discussed below,

---

[17] (...continued)

shared facilities or employees with PHCS and therefore we cannot assume that they did not. Opinion at 35 n.45. But it is not reasonable to infer that two separate legal entities share facilities or employees, absent some evidence that they do. And there is none in this case.

James did not call Concert on April 7 to determine the Rush providers' network status, but, as he testified, he called because Susan was being admitted to the hospital and "you had to call for preadmission." R.115-3 at 72–73.

> 2. James called Concert twice on April 7, 2006, to inform Concert that Susan was being admitted to the hospital, as required by the insurance policy's pre-certification provisions. James did not call to inquire about the network status of the Rush providers and nothing James said would put the Concert telephone representatives on notice that James was concerned about the providers' network status.

The *en banc* court concludes that a reasonable trier of fact could conclude that James called Concert to determined whether the Rush providers were in Susan's network, Opinion at 30, and that "Concert was aware (or, at the very least, that it should have been aware) that Mr. Killian was attempting to determine whether Rush and the physicians who were about to perform surgery on Mrs. Killian were within Mrs. Killian's network." Opinion at 28. I disagree.

First, the record does not support the conclusion that James called Concert to determine whether the Rush providers were in Susan's network. In fact, in his deposition James himself negates any such inference—twice. After summarizing the *first* telephone call, James stated: "So that was my reason of the phone call to tell them she was going to be admitted to the hospital. And we never determined anything. She said—I

believe she said, 'Give me a call back.'"[18] R.115-3 at 71. Second, after discussing *both* telephone calls, the defendants' attorney asked James: "What was it that prompted you to call on April 7th?" James responded: "What prompted me to call? The fact that she was going to be admitted to a hospital and the fact that you had to call for preadmission."[19] R.115-3 at 72–73. When

---

[18]   While acknowledging that James testified that he and the Concert representatives "never determined anything" during the first telephone call, the *en banc* court then states that James "also testified that, at the end of the two calls, he believed that Mrs. Killian's surgery would be covered '[b]ecause nobody ever said these [providers] are out-of-network.'" Opinion at 30. However, contrary to the court's statement, James never testified that "at the end of the two calls, he believed that Mrs. Killian's surgery would be covered." Opinion at 30. Rather, during James's deposition, James was asked why he believed, as attested to in his affidavit, "that Susan's medical bills would be covered by Concert Health Plan and [why he] had no reason to believe they would not be covered." R.115-3 at 135. To that question, James responded: "Because nobody ever said these are out-of-network. They are out-of-pocket expenses that you are going to have to incur. You see enough people, you think somebody would have said something." *Id.* The exchange continued: "Q: At no time did any of the treating physicians or hospitals tell you that they were out-of-network? A: No." *Id.*

[19]   The court states that "Mr. Killian testified that, in making the *second* telephone call, he was calling 'for preadmission,' as he was instructed to do by Mrs. Killian's insurance card. … Taking these facts in the light most favorable to Mr. Killian, a reasonable trier of fact could conclude that Mr. Killian made the second call to obtain the required 'certification,' or 'UTILIZATION REVIEW,' for his wife's surgery." Opinion at 31 (emphasis added). The record indicates otherwise. As just quoted, after discussing *both* telephone calls, James was asked "[w]hat was it that prompted you to call on April 7th?" R.115-3 at 72–73. James responded "[t]he fact that she was going to be admitted to a hospital and the fact that you had to call for

(continued...)

asked who told him you had to call for preadmission, James stated "I believe I read it on the card."[20] R.115-3 at 73.

Significantly, James *never* stated in his deposition, or in the affidavit that he filed in this case, that he called Concert on April 7 to determine whether the Rush providers were in-network. Had that been the purpose, or even *a* purpose of the call, James's attorney could (and would) have asked James whether he had called on April 7 to also determine the Rush providers' network status. But his attorney did not, even though in his complaint James specifically alleged that he "called Concert Health Plan Insurance Company to confirm that Rush University was a network provider under the Concert Health Plan (or Royal Management Corp. Health Insurance Plan)." R.119-2 at 10. Thus, even though James alleged in his complaint that he called to confirm the Rush

---

[19] (...continued)

preadmission." *Id.* Moreover, as noted above, in discussing the *first* telephone call, James stated "[s]o that was my reason of the phone call to tell them she was going to be admitted to the hospital." R.115-3 at 71. According to James's own testimony, he made both calls for the same purpose—because Susan was being admitted to the hospital and you needed to call for preadmission.

[20] The documents provided to Susan also clearly laid out the importance of informing Concert of hospitalizations. James, who was not covered by the insurance and had not reviewed any of the enrollment information Susan received, knew this from the insurance card and also because he and Susan had just gone through the same process when Susan had been admitted to Delnor hospital. R.115-3 at 263–64.

providers' network status, when it came time to come forward
with proof to support that allegation, James remained silent[21].

"The purpose of summary judgment is to 'pierce the
pleadings and to assess the proof in order to see whether there
is a genuine need for trial.'" *Matsushita Elec. Indus. Co., Ltd. v.
Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). James presented no
evidence that he called Concert on April 7, 2006, to determine
the network status of the Rush providers and he easily could
have made such a statement in his affidavit or deposition
testimony. Because "[a] non-moving party cannot simply rest
on its allegation without any significant probative evidence
tending to support the complaint," *id.* at 249, the court is
wrong to infer that James called to determine the Rush provid-
ers' network status when he had the opportunity to say he did
so for that reason, but did not; and in fact stated a different
purpose when asked, under oath, for the purpose of the call.

Second, even if James subjectively intended to determine
the network status of the Rush providers when he called
Concert on April 7, the Concert representatives had no reason
to know that that was a purpose of James's April 7 telephone
calls. In discussing the April 7 exchanges, James explained that
he told the representatives that "Susan is going to be admit-

---

[21] In his deposition, James also testified that prior to her admission at
Delnor, Susan had a CAT scan at a facility in St. Charles and that he never
called Concert to determine if the facility was in network; he did not know
whether Susan had called. R.115-3 at 120. He also did not know whether
Susan had called to determine Delnor's network status. R.115-3 at 40. In
fact, it appears that some of the doctors at Delnor were not in Susan's
network. R.115-3 at 114.

ted"; "I'm trying to get confirmation that we are going to be—my wife is going to be admitted to Rush"; "she is going—they want to admit her because we already determined the tumor had to come off"; "I said she was being admitted to the hospital and they were going to do the surgery. … Brain surgery." R.115-3 at 71-72, 124. Nothing James said during these conversations put the Concert representatives on notice that a purpose of his call was to learn the network status of the Rush providers. Rather, a reasonable representative would believe that James telephoned Concert because Concert required insureds to notify it of hospital admissions—since that was what James told the telephone representatives. As James said, in his own words: "I said she was being admitted to the hospital and they were going to do the surgery. … Brain surgery." Under these circumstances, it is not reasonable to expect the representative to have "instructed Mr. Killian that she was unable to locate an entry in her system for 'St. Luke's' and that she could make no representations at that time as to whether the provider was in-network." Opinion at 31.[22]

---

[22] The court's reasoning that "[t]he first Concert representative's attempt to locate 'St. Luke's' suggests that she was aware of his need to determine Rush's network status," Opinion at 35, is also misplaced. To document an insured's hospital admission, Concert would need to record the name of the hospital and Concert's attempted to locate "St. Luke's" therefore does not suggest that the representative was aware of James's need to determine the network status. The court also reasons that Concert "should have known that beneficiaries such as Mr. Killian would be calling this line [the customer service/utilization review number] to determine whether certain providers were in their network." Opinion at 32. But that same number was given for utilization review and customer service. Opinion at 32. Thus,

(continued...)

3.  *Kenseth v. Dean Health Plan, Inc.*, 610 F.3d 452 (7th Cir. 2010), is not analogous to the Killians' situation. In *Kenseth*, the insured specifically asked whether an upcoming surgery would be covered under her insurance policy and was told by a representative of the insurance company that it would be, but the insurance company later denied coverage. The Certificate of Insurance in that case was ambiguous on whether there was coverage and failed to identify a means by which a participant could obtain an authoritative determination on a coverage question. The Certificate also invited participants to call customer service with coverage questions but did not warn them that they could not rely on any advice they received. *Kenseth I*, 610 F.3d at 469–78. Here James did not ask the Concert representatives any questions, but merely informed them that Susan was being admitted to the hospital. And Susan's Certificate of Insurance was clear on the different levels of reimbursement for in-network and out-of-network providers and on how to determine the network status of a provider.

In holding that a reasonable finder of fact could conclude that the defendants breached their fiduciary duty to Susan by

---

[22] (...continued)

Concert representatives could expect to be told of hospital admissions or asked question on any topic regarding the health insurance plan, and there is no reason they would automatically infer that a caller to that number was seeking to determine the network status of a provider.

not informing James during the April 7, 2006 telephone calls that the Rush providers were out-of-network, the court relies extensively on *Kenseth v. Dean Health Plan, Inc.*, 610 F.3d 452 (7th Cir. 2010). But in doing so, the court separates the language of *Kenseth* from the facts in that case.

In *Kenseth*, the plaintiff had undergone a vertical banded gastroplasty ("VBG"), often colloquially referred to as a "stomach-stapling," in 1987. *Id.* at 457. Years later, as a complication of the VBG, Kenseth began to suffer from gastric stenosis, which in turn caused her "to experience a variety of aliments," including severe acid reflux, erosion of the esophagus, pneumonia, and severe hair loss. *Id.* To address these problems, Kenseth underwent an endoscopic procedure which initially resolved the problem. *Id.* at 458. But after it recurred, Kenseth saw a bariatric surgeon, Dr. Huepenbecker, who recommended that Kenseth "undergo a Roux-en-Y gastric bypass procedure as a longer-term solution to the complications." *Id.*

Prior to the surgery, Kenseth contacted her health insurance company, Dean Health Plan, to determine whether the surgery would be covered by insurance. *Id.* at 459. The Certificate of Insurance encourages participants to do so, stating: "If you are unsure if a service will be covered, please call the Customer Service Department … prior to having the service performed." *Id.* at 458. Kenseth spoke with a customer service representative, Maureen Detmer, and "averred that she told Detmer she would be having 'a reconstruction of a Roux-en-Y stenosis, [sic]' and when Detmer asked her to explain the nature of the surgery, Kenseth told her 'it had to deal with the bottom of the esophagus because of all the acid reflux I was having.'" *Id.* at

459-60. After checking with her supervisor, Detmer advised Kenseth that the procedure would be covered by her insurance, subject to a $300 copayment. *Id.* at 460. Based on these assurances, Kenseth underwent the surgery on December 6, 2005. *Id.*

The day after the surgery, Dean (which under its policy was not bound by oral representations concerning coverage) denied coverage for Kenseth's surgery and all associated services based on two provisions in Kenseth's health insurance policy. First, the policy listed non-covered services as "[a]ny surgical treatment or hospitalization for the treatment of morbid obesity." And in the "General Exclusions and Limitations" provisions was an exclusion for "[s]ervices and/or supplies related to a non-covered benefit or service, denied referral or prior authorization, or denied admission." *Id.* at 457. Because complications from Kenseth's earlier VBG surgery necessitated Kenseth's Roux-en-Y surgery, Dean concluded that the 2005 surgery was not covered; it similarly concluded that there was no coverage for a second hospital stay necessitated by complications of the 2005 surgery. Kenseth was left with approximately $78,000.00 in medical bills.

Kenseth sued, alleging claims under state law and under ERISA for breach of fiduciary duty and equitable estoppel. The district court granted Dean summary judgment and on appeal this court reversed on the breach of fiduciary duty claim, stating:

> As we detail below, the facts would permit the factfinder to conclude that Dean breached the obligation of loyalty it owed to Kenseth by

> providing her with plan documentation that was
> unclear as to coverage for her surgery, by invit-
> ing her and other participants to call its customer
> service representatives with questions about
> coverage but omitting to warn callers that they
> cannot rely on the answers they are given, and
> by failing to inform participants how they might
> obtain answers from Dean that they could rely
> upon.

*Id*. at 464.

As this summary of *Kenseth* makes clear, the Killians' situation now before us is *nothing* like *Kenseth*. In *Kenseth*, the insured called and asked whether there would be coverage for a specific surgical procedure. Here James called and informed Concert that Susan was being admitted to the hospital and made no inquiry about the Rush providers' network status or the reimbursement rates for the medical services. In *Kenseth*, the insurance agent, after checking with her supervisor, erroneously stated that the procedure the plaintiff asked about would be covered. But after the operation, the insurance company denied coverage. Here the insurance company did not make any representations to James concerning whether the Rush providers were in-network or out-of-network and did not deny coverage for Susan's brain surgery. In *Kenseth*, the certificate was ambiguous concerning whether the Roux-en-Y surgery was a covered procedure. With Susan, the certificate of insurance was clear concerning: (1) the reimbursement rates paid to in-network and out-of-network providers; (2) an insured's responsibility for any expenses above the maximum allowable fee for out-of-network providers; (3) the need to

inquire on the network status of the providers either via telephone or on-line; (4) an insured's right to choose any provider they wished; and (5) an insured's obligation to notify Concert of any hospital admissions for pre-certification that the procedure was medically necessary. In *Kenseth*, this court held that the insurance company had a duty to disclose to callers that they could not rely on representations made by agents of the insurance company that a medical procedure was covered. That duty to disclose was directly related to the question Kenseth asked and which the insurance company answered, namely whether surgery to perform a Roux-en-Y was covered by the insurance policy. *See Kenseth*, 610 F.3d at 472 (the fiduciary exposes itself to liability for the mistakes that plan representatives might make in answering questions *on that subject*) (emphasis added). Here, the information that the Concert representatives provided James (i.e., that he could go ahead[23] with whatever had to be done and that a hospital admission for brain surgery was "okay") concerned pre-certification and whether the procedure was medically necessary[24]. James's statement that Susan was being admitted

---

[23] In discussing the "go ahead" given James, the court states that James was not warned "that the 'go ahead' was not to be understood as an authorization." Opinion at 30. But the "go ahead" was an authorization of the only thing which needed to be authorized—a hospital admission. Concert did not need to authorize treatment by out-of-network providers, as "the choice of provider is [the insured's.]" R.77-3 at 5, 11–12.

[24] The Certificate of Insurance explained what Concert would do upon receiving notice of a hospital admission, stating it would advise the insured "if Preservice Review and Precertification of the treatment plan is required"

(continued...)

for brain surgery and Concert's "okaying" of that procedure as medically necessary, were unrelated to the question of the network status of the providers[25]. And finally in *Kenseth,* the insured was not told how to definitely determine whether there was coverage. Here, insureds were told how to determine if a provider was in-network or out-of-network, including by calling Concert or the PHCS provider line or going on-line. *Kenseth* is therefore distinguishable.

Notwithstanding these stark differences between *Kenseth* and the facts of this case, the *en banc* court relies on several passages in *Kenseth* which summarize general breach of fiduciary duty principles to support its holding. But even those passages from *Kenseth* do not support a breach of fiduciary duty claim here. For instances, the *en banc* court relies several times on passages from *Kenseth* discussing the fiduciary duty owed to insureds when the insured "request[s] information" or poses "questions" to the fiduciary. *See, e.g.,* Opinion at 25–34.

But in this case, James did not request any information or pose any questions. Rather, during both telephone calls, James stated a fact—that Susan was being admitted for brain

---

[24] (...continued)
by Concert. R.77-3 at 34. A "go ahead with whatever needs to be done" and an "okay," confirmed the admission and that Concert did not require any additional review to certify the hospital admission. R.115-3 at 239.

[25] As noted above, the Certificate explained that precertification review was a determination of whether a medical service was medically necessary and that "[p]recertification of medical necessity is subject to the limitations, exclusions, and provisions of this certificate … ." R.77-3 at 23.

surgery[26]. And Susan was required by her policy to call Concert and inform them of any hospital admissions, at which point Concert would inform the insured if something further was required (i.e., "if Preservice Review and Precertification of the treatment plan is required" by Concert). R.77-3 at 34. So we do not have a case where the mere making of the telephone call implies a question.

Likewise, "the only status and situation," Opinion at 25, 34 (quoting *Kenseth*, 610 F.3d at 466), "circumstance," Opinion at 25, 29 (quoting *Kenseth*, 610 F.3d at 466), or "predicament," Opinion 26 (quoting *Kenseth*, 610 F.3d at 467), of which Concert knew was that Susan had already seen her doctor and was being admitted for brain surgery. Nothing James said in either telephone conversation put Concert on notice that the "situation," "circumstance," or "predicament" was that James was inquiring about the network status of the Rush providers. Accordingly, those passages from *Kenseth* provide no support for the *en banc* court's decision.

The court again quotes *Kenseth* when reasoning that James "should not be penalized because he failed to comprehend the technical difference between '[go ahead]' and 'the provider is

---

[26] Brain surgery is obviously medically necessary and it therefore makes sense that the first Concert representative told James to "go ahead with whatever had to be done," but to call back when he knew the correct name of the hospital. R.259-5 at 124–25. Similarly, once James called back and the Concert representatives had determine the correct name of the hospital (Rush), there was nothing to do but "okay" the hospital admission. And Johny Antony, the Vice President of Operations for Concert, confirmed in his deposition that approval was given for the brain surgery "based on the treatment that was being sought." R.115-3 at 239.

in-network].'" Opinion at 30 (quoting *Kenseth*, 610 F.3d at 467)[27]. This case, though, does not involve a "technical difference," but rather two very fundamental and distinct concepts easily understood by the average layperson: (1) An insured must notify the insurance company of a hospital admission for pre-certification that the procedure is medically necessary; and (2) the reimbursement rate for medical providers will depend on the network status of those providers. The enrollment documents provided to Susan explained both of these points clearly and in simple, understandable terms. In short, there is no technical question involved.

---

[27] This quote actually originates in *Eddy v. Colonial Life Ins. Co. of Am.*, 919 F.2d 747 (D.C. Cir. 1990), and is then excerpted in *Kenseth*. *Kenseth*, 410 F.3d at 467. In *Eddy*, the plaintiff learned that his employer was cancelling its group health insurance coverage just days before he was to undergo exploratory surgery. The plaintiff called his health insurance company, explained the situation, and asked whether he could "continue" his group, employment-based coverage. The insurer told Eddy he could not, but never mentioned the option of converting to individual coverage. Given the facts in *Eddy*, the court held it was a breach of fiduciary duty for the insurer not to disclose to Eddy that he could convert his policy, stating: "Regardless of the precision of his questions, once a beneficiary makes known his predicament, the fiduciary is under a duty to communicate … all material facts in connection with the transaction which the trustee knows or should know. Eddy should not be penalized because he failed to comprehend the technical difference between 'conversion' and 'continuation.' The same ignorance that precipitates the need for answers often limits the ability to ask precisely the right questions." *Id.* at 751.

Finally, the Certificate of Insurance and the enrollment packet[28] Susan received were not "silent or ambiguous" on the relevant issues. *See* Opinion at 26, 38 (quoting *Kenseth*, 610 F.3d at 472). Rather, these documents were absolutely clear on the differing levels of reimbursement for in-network and out-of-network providers and that insureds were responsible for charges above the maximum allowable fee. The documents were also clear on how an insured could determine network status, providing both directions to call the PHCS network number or to find the information on-line.[29] Further, the documents clearly explained the importance of notifying Concert of any hospital admissions for pre-certification of medical necessity. Because the enrollment packet Susan received clearly explained all of the relevant provisions, the defendants did not have a fiduciary duty to remind James of the basic terms of Susan's health insurance coverage, such as that payment reimbursement rates depend, in part, on the

---

[28] The court is correct that the documents the defendants provided did not comply with the technical requirements of ERISA. Opinion at 13. But the enrollment packet Susan received upon enrolling in the Concert health insurance plan clearly explained all of the relevant provisions in simple, straightforward terms. And even with this knowledge, Susan chose the less expensive, and more limited, insurance plan.

[29] James testified that after Susan began receiving bills from Rush, he attempted to determine the network status of the Rush providers on-line but was unable to determine whether they were in-network or not. James, however, also testified that he was "not very computer literate," R.115-3 at 131, and the record included simple step-by-step instructions with screen shots showing the simplicity of determining provider network status on-line, confirming James's self-assessment. R.259-5 at 10–12.

providers' status as in-network or out-of network. *See, e.g., Griggs v. E.I. DuPont de Nemours & Co.*, 237 F.3d 371, 381 (4th Cir. 2001) ("ERISA does not impose a general duty requiring ERISA fiduciaries to ascertain on an individual basis whether each beneficiary understands the collateral consequences of his or her particular election."); *Maxa v. John Alden Life Ins. Co.*, 972 F.2d 980, 985–86 (8th Cir. 1992) (finding no fiduciary duty "individually to notify participants and/or beneficiaries of the specific impact of the general terms of the plan upon them"); *Harte v. Bethlehem Steel Corp.*, 214 F.3d 446, 454 (3d Cir. 2000) (stating it is "uncontroversial … that a fiduciary does not have to regularly inform beneficiaries every time a plan term affects them")[30]

    D. Susan's denial of benefits claim is moot because she never paid the Rush providers and her estate has since been closed, so there is no longer any harm to Susan or her estate. If her claim were not moot, remand is most expeditious.

---

[30] Because the defendants did not have a fiduciary duty to inform James that Rush was out-of-network, the breach of fiduciary duty claim cannot succeed. But even if James could succeed on Susan's estate's breach of fiduciary duty claim, whether monetary payments (which *Cigna Corp. v. Amara*, 131 S. Ct. 1866, 1880 (2011), held could be an appropriate equitable remedy), are appropriate in this case is questionable. *See generally Kenseth v. Dean Health Plan, Inc.*, 722 F.3d 869, 892 (7th Cir. 2013) (Manion, J., concurring).

As explained above, Susan's denial of benefits claim is moot. However, if that claim were not moot, I remain comfortable with the panel's decision, namely directing the parties to submit a stipulation concerning the network status of the Rush providers on remand. Opinion at 3 n.3, 10 n.20. At this point, that solution seems the most expedient. However, should the parties be unable to agree to a stipulation, the district court can easily resolve the issue on remand on the basis of the current record. Specifically, the district court can rely on the deposition testimony of Johny Antony, the Vice President of Operations for Concert, R.115-3 at 250, 270, and correspondence between Concert and University Anesthesiologists, to confirm the network status of the Rush providers. R.77-7 at 7, 11.

## III.  CONCLUSION

James suffered a tragic loss, and finding out that Susan's health insurance did not cover about $80,000 in medical expenses only added to his grief. James deserves sympathy, but in the final analysis, the mistake was the Killians' and not the defendants'. Once they received Susan's dire and devastating diagnosis they did not consult with, or consider the terms of, Susan's health insurance plan. This is entirely understandable, but their mistake does not create liability for the defendants. And in creating such liability today, the court's decision has wide-spread ramifications. Health insurance is already expensive. And the court's holding will only further increase the cost of health insurance because insurance companies, to prevent being held liable for expenses not covered by their policies, will require their representatives to review the policy provisions with each caller. This is not a no-cost proposition: It costs insurance companies money to staff telephones and the

more policy terms the representatives must cover, the more it will cost. And the higher the administrative expenses, the fewer dollars spent on health care—and the higher the premiums. Insureds then may not be able to afford the policy they prefer and instead may opt for a less costly option with more restrictions. That is what Susan did in this case: Susan selected a less expensive health insurance plan that used the PHCS-Open Access Network, and that choice left Susan were fewer options and higher out-of-pocket expenses. While it is understandable to feel sympathy for those facing significant medical bills, we cannot bend the law to protect individuals from their own choices and their own mistakes.[31]

Health insurance is also complicated. It must be in order to address the multitude of potential health care scenarios. ERISA requires a Summary Plan Description ("SPD") for that very reason—to provide lay people a straightforward explanation of the terms of their health insurance coverage. And I agree with the court that the defendants did not provide an SPD which complied with ERISA and that statutory penalties are appropriate for that failure. But the failure to provide an SPD that complied with ERISA did not harm Susan because the defendants provided Susan with an enrollment packet that clearly explained all of the provisions relevant to Susan's situation. Specifically the enrollment packet explained the reduced reimbursement rates paid to out-of-network providers

---

[31] I also agree with Judge Easterbrook's second suggestion that the majority's approach can make participants worse off, and I join that portion of his dissent. Easterbrook, J., concurring in part, dissenting in part, at 51–53.

and how to determine if a provider was in the PHCS-Open Access Network. Yet there is no evidence that Susan or James inquired whether Rush was within her network. Unfortunately it was not, and as a result Susan was left with hefty medical bills, although in the end neither Susan, James, nor her now-closed (for purposes of creditors filing claims) estate paid these bills. And there is no longer any legal liability on those unpaid bills. In the final analysis that makes this case, for the most part, moot. Remanding to hold the defendants liable for statutory damages for their violations of ERISA is appropriate. But no more. I CONCUR IN PART and DISSENT IN PART.